ALBANY,
Feb. 1825.

Dickey
v
Insurance Co

## DICKEY *against* THE NEW YORK INSURANCE COMPANY.

If the injury to a ship by the perils insured against, exceed one half her value, the insured may abandon to the underwriters as for a total loss, which cannot afterwards be turned into a partial one. Accordingly, the abandonment may be enforced, tho' the ship afterwards be repaired by the master, and proceed on her journey.

But the abandonment must be before the vessel is fully repaired, and able to proceed on her voyage. If she be in fact repaired, the abandonment is void, though this be not known to the assured.

ASSUMPSIT upon a policy of insurance, on one-half the body, tackle, apparel and other furniture of the ship Frances Henrietta, Allyn, master, valued at $20,000, on a voyage from Antwerp to one or more ports in the India or China Seas; and at and from the port or ports of lading to New York, or a port in Europe not north of Holland; tried before WOODWORTH, J. at the New York sittings, in June, 1822.

The declaration was varied in its counts, to meet a total or partial loss. The evidence was, that the ship proceeded on her voyage July 1st, 1818, for Batavia, in the island of Java, where she arrived in good condition on the 2d day of December in the same year; that she sailed thence with a full cargo, a considerable portion of which belonged to the plaintiff, bound to Antwerp in Holland, on the 24th of January, 1819; but while sailing on her voyage, from the 20th of February to the 4th of March, she encountered a succession of winds and tempestuous weather, became leaky, and was so much broken and damaged that it was necessary for her preservation to proceed for Port Louis in the

It is the actual state of things, therefore, at the time of the abandonment; and not the state of the party's information, that decides the validity of an abandonment.

Where a ship bound to Antwerp was insured, and repaired on account of sea damage, at Port Louis, in the Isle of France; and the expense of a part of the repairs was defrayed by a sale of the cargo and the residue charged upon the remainder of the cargo by a respondentia bond; *held*, that no lien was thereby created upon the ship, which could be taken into the account in estimating the insured's right to abandon as for a total loss.

In making an abandonment, the assured is bound to assign the true cause: *e. g.* if he abandon on account of sea damage only, he cannot avail himself of the fact, that the ship was afterwards incumbered by the expense of repairs. As to the latter, he should make a new abandonment.

Where a ship has sustained damage by the perils insured against to more than one-half her value, her restoration, in order to divest the right of abandonment, must be complete and perfect; and if, though in fact restored, she still remain subject to a lien for the expense of her repairs, to more than half her value, this is not such a full and beneficial restoration as to take away the right to abandon.

Items included in, and manner of estimating the amount of repairs, deducting one-third new for old, after first deducting the value of the old materials. Per SAVAGE, Ch. J.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

Isle of France, where she arrived in distress on the 7th of March, 1819.   Here the ship was regularly surveyed; and the surveyors reported that she should be unloaded immediately, as well for her safety and the safety of her cargo as for enabling them to ascertain the damages she might have sustained.   The cargo was thereupon partially unladen and put into the custom house of St. Louis : and a second survey held on the 16th of March ; when it was thought necessary farther to unlade.   The unlading was accordingly resumed, and continued to the 20th ; when, on a third survey, it was recommended that the ship should be entirely unloaded ; which was accordingly done, by the 27th, with the exception of some few articles ; and the ship placed in the usual and proper situation for undergoing a final survey and repairs.   Here she was farther unladed, but not entirely so ; when on the 28th and 29th, the wind was very severe, and finally increased to a severe hurricane.   On the 30th the ship was driven on shore, and suffered very great additional injury.   On the 14th day of April, 1819, a fourth survey was held, and the surveyors reported that all the ship's injury had arisen from the above causes, and recommended the proper repairs.   These repairs were commenced on the 7th of May, 1819, and prosecuted with due diligence, under the direction of the master.

A portion of the cargo consisting of rice, principally belonging to the plaintiff, together with certain ship materials, were, on the 5th and 22d April, and 3d day of June, 1819, sold under the direction of the Court of Admiralty of the Isle of France, to defray the expenses of repairs, amounting in net proceeds to $10,972 50.   This being the only part of the cargo which could be sold without great sacrifice, and not near paying the expenses of the repairs, the master was obliged to borrow of one Reush $8925, upon respondentia of the cargo, and he executed a respondentia bond accordingly, which also bound him to the payment personally.   The respondentia bond was made payable ten days after the arrival of the ship at a port in the Netherlands. The repairs being completed, and the residue of the cargo re-shipped, and certain goods taken on board upon freight, by permission of the Court of Admiralty, on the 28th June,

1819, the ship being tight, staunch and strong, set sail from Port Louis for a port in Holland, and arrived at Antwerp on the 1st October 1819, where the cargo was delivered in good order to the consignees, and where the averages upon the vessel, freight and cargo, in the premises, were regulated and settled under an appointment and order of the tribunal of commerce of Antwerp, according to the usage and law of Holland; and by that tribunal ordered to be carried into execution. The cargo was afterwards sold at Antwerp by the consignees, who charged the sum due on bottomry in account with the plaintiff.

In the mean time, on the 6th day of July, 1819, while the ship, being in good repair, was prosecuting her voyage from Port Louis to Antwerp, the plaintiff caused to be delivered to the defendants the following letter of abandonment:

"*New York, 6th July*, 1819.
*To the President and Directors of* }
   *the New York Ins'ce Co.;* }
Gentlemen,

I have advice from the Isle of France, dated 12th April last, that my ship Frances Henrietta had put into that port in distress on the 7th March; and on the 28th and 29th of March, she was under the influence of a hurricane that parted her cables and drove her on shore beating over a bed of hard sand and coal, by which she has suffered great damage, as well in the hull, as to her rigging, spars, &c. leaving the lower masts only standing. In consequence of this disaster, and the great injury sustained to the voyage this ship was pursuing, I am obliged to abandon my interest therein, to my underwriters; and you are hereby required to take notice, that I abandon to your office so much of the ship and cargo as you have insured; and that I shall claim from you thereon a total loss.

Respectfully,
yr. ob. st.,
*Rob. Dickey.*"

This letter was, in due season, followed by a delivery of the usual preliminary proofs.

The ship sailed from Antwerp to New York on the 5th December, 1819, having in freight 20 hogsheads of madder, and 40 or 50 boxes of muskets. Being a foreign bottom, she had not been able to procure a cargo at Antwerp. She arrived in the port of New York on the 4th of January, 1820, after having sustained some additional damage from a succession of violent and tempestuous weather in the course of her passage.

The whole disbursements of the ship at Port Louis, amounted to $20,191 74, including repairs estimated at $14,281 72.

The plaintiff's counsel read in evidence a copy of the respondentia bond from the master to Reush, dated at Port Louis, June 6th, 1819, in the penal sum of £3914 9s. 6d., the condition whereof recited that the master had, for the use and payment of the repairs and expenses incurred in that harbor upon the ship, taken up and received of Reush, $8925, current money of Mauritius, fixed between the parties at £1957 4s. 9d. sterling, to run at respondentia on the cargo of the lading of the ship, to proceed to a port in the Netherlands, &c. ; and, for the further security of Reush, the master thereby consented and agreed, for himself, his heirs, &c. to engage and assign over to Reush, the several wares and merchandize, laden, or to be laden, on the ship, and which wares and merchandize were, by the bond, declared to be thus mortgaged and assigned over, and not to be delivered to any other use or purpose whatever, till payment of the bond.

The condition of the bond then was, that if the master should pay the money borrowed, at the expiration of 10 days after the arrival of the ship at a port in the Netherlands, or in case of loss, the customary due on salvage, then the bond to be void, &c. otherwise, &c.

The plaintiff also proved that Holland was, in 1818, 1819, and 1820, governed by the Code de Commerce, part of the civil code of France ; and read in evidence articles 190 and 191, of the Code de Commerce.

A verdict was taken for the plaintiff, for $20,000, subject to a case, and with liberty to either party to turn it into a

special verdict, or bill of exceptions; the amount of the verdict to be increased or diminished, and subject to adjustment, as the Court should direct; and if a balance should appear in favor of the defendants, then a verdict and judgment to be entered accordingly, &c.

This cause was argued at the last May term; and the only question made at the bar was, whether the plaintiff was entitled to recover as for a total or partial loss.

*D. B. Ogden*, for the plaintiff, contended that he was entitled to recover for a total loss. He said, he did not rely on an actual, but should contend that a technical total loss was shown. It will not be denied, that the *bona fide* expenses and repairs, incurred in consequence of the perils insured against, exceeded one-half the value of the vessel; and so far, there can be no difference upon the propriety of our claim. But it will be said that the abandonment was too late; that it should have been before she left the Isle of France, in full repair, to proceed on her destined voyage

To be good, the abandonment must be founded on such a state of facts as will justify the party in considering the loss total. At what time is it necessary that these facts should exist? When the information reaches the assured, or when the abandonment is made? The supposed, or actual state of the subject, at the time of abandonment? We say the belief of the assured is to govern, if the ground of his belief was once true; though such grounds may, at the time he abandons, have ceased to exist. To decide otherwise, would overturn the first principles in the law of insurance. In all cases of a technical total loss, it is optional with the assured, whether he will abandon or not. If the whole subject be destroyed, no abandonment is necessary. If these positions be true, does it not follow, that the assured must await the proper information? Without this, he cannot act; and it is idle and tantalizing to give him the right to elect, and yet deny him the means of exercising it beneficially or properly. The only means he can have, is information received. Shall the whole effect be destroyed, because the vessel was repaired before the abandonment took place? If so, all

the talk about notice and election in the books is a dead letter, in those instances where a vessel is injured at so great a distance that the assured cannot keep his eye upon her.

We are aware that some cases lay down a contrary rule; but none of them go to the length contended for here. *Bainbridge* v. *Neilson*,(a) was a case of capture, and almost immediate re-capture; and, even under such circumstances, the doctrine that the assured could not abandon on information received, after the vessel was reclaimed, was considered somewhat novel, as will be seen by a report of the same case, in Campbell.(b)   This case has been followed as to capture, but no other ground of abandonment.  (*Dorr* v. *N. Engl. M. Ins. Co.*(c) *Fitzsimmons* v. *The N. P. Ins. Co.*(d) *Alexander* v. *The Balt. Ins. Co.*(e) and *Mumford* v. *Church*,(f) are all cases of technical total loss by capture.   *Smith* v. *Robertson*,(g) questions the doctrine even as to capture; and in *M'Iver* v. *Henderson*,(h) the distinction is taken, that in those cases where, on capture, a recovery of the property defeats the abandonment, there must be a restitution of the ship in an undamaged state; and the same distinction is holden in the Common Pleas.(i)   "If the insured, while he has a right to consider the loss as total, elect to abandon, this will fix the nature of the loss; and no subsequent event can render it partial."(j)   Dickey was bound, after he received information of the loss, to abandon the very first opportunity.(k) The abandonment relates to, and takes effect from the loss. The master, from that time, is the agent of the underwriters.   In going on to repair, he acts for the benefit of all concerned; but he is never considered the agent, or rather arbiter, who is to decide whether there shall or shall not be an abandonment.(1)   This is vested, by law, in the discretion of the assured solely.   We admit that, if the assured goes on and repairs, it might be a waiver; but this must be done by himself, through his express orders, or legal agent; otherwise, you deliver him over to the control of a stranger.

The only case, directly against us, is *Humphrey* v. *Un. Ins. Co.* in the C. C. U. S. Mass. a note of which is given by Mr. Phillips.(l)   If that case be correctly reported, we

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

(a) 10 East, 329.

(b) 1 Campb. Rep. 237, S. C.

(c) 4 Mass. Rep. 221, 229.
(d) 4 Cranch, 185, 201.
(e) Id. 370, 372.
(f) 1 John. Cas. 147. 1 Caines' Cas. in Err. 21, S. C.
(g) 2 Dow. 474, 482.
(h) 4 M. & S 576.
(i) Hudson v. Harrison, 3 Brod. & Bing. 97, 105.
(j) 2 Marsh. on Ins. 589.
(k) Mitchell v. Edie, 1 T. R.   608.   2 Marsh. on Ins. 591.

(1) 1 T. R. 613, 614.

(l) Phil. on Ins. 401

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

have only to say, that Judge Story (a thing we admit not very usual with him) was most clearly in an error. He is made to speak of the assured's *electing* to repair, and thereby losing his right to abandon. Now, it is extremely difficult, to see how the assured could elect to repair, when he knew nothing of the repairs which were going on, and neither he, nor the law for him, ever created an agent who was authorized to do this.

But suppose that case to be law; its principle must be, that the loss turns out in fact to be partial, the ship being restored, and proceeding on her voyage. Such is the rule, we have seen, even in case of capture. If we can show that she never was restored, the case does not apply. To make out payment for the repairs, all the cargo which could be sold to the least advantage at Port Louis was disposed of; and the master was obliged to *hypothecate* the residue. This was perfectly within the master's general power, the case being one of necessity.(*m*) The only difference between the opposite counsel and us must relate to the consequences of the *respondentia* upon the cargo. This must be decided, not by the law of the United States, but Holland, to which the contract had reference; and where the vessel was when the claim was enforced.(*n*) The owners of the hypothecated cargo had a lien over on the ship.(*o*) The loan was not repaid. It was not made on the credit of Dickey. Can it be said, then, that the ship was, to all intents, restored to him? No. He was still liable to lose his ship by an enforcement of the lien. In point of fact, she was never under his control, nor restored to his possession.

*(m)* U. Ins. Co. v. Scott & Seaman, 1 John. Rep. 106. Abb. on Ship. 2 Am. ed. 157, pt. 2, ch. 3, s. 29.
*(n)* Vid. Abbott on Shipp. 2d Am. ed. 133, 4, pt. 2, ch. 3, s. 9.
*(o)* Id. Hall's Maritime Loans, 92, 93, 95.

*Emmet*, (same side,) read that part of the Code de Commerce referred to by the case, to show the law of lien at Antwerp; and cited *Consequa* v. *Willings*.(*p*)

*(p)* 1 Peters' Rep. 225

*J. Duer*, for the defendants. The case sought to be made out by the plaintiff is certainly one of the first impression; and we had supposed that at this time of day, the law was so well settled, that the right to abandon depends on the state of facts at the time of the abandonment, as to preclude all argument. At most, it is barely necessary to refer to,

and briefly review the cases on which we rely. They are all collected by Mr. Phillips, in his treatise on Insurance ;(q) and it cannot be necessary for us to refer to the books which contain them. Gentlemen are mistaken in supposing that the rule began with *Bainbridge* v. *Neilson.*(r) The same rule, in substance, was laid down and acted upon by Lord Mansfield in *Goss* v. *Withers,*(s) though in more general terms. It is the same thing in this country, whether the loss has, at the time of the abandonment, ceased to be a technically total one or not. If the ship be repaired and proceeding on her voyage, in either event the right of abandonment is gone. The assured takes this risk. True, it is otherwise in England. To prevent an abandonment, the property must not only be restored, but in such a condition as that the loss ceases to be total; and *Smith* v. *Robertson,*(t) was a case of the latter kind. None of the cases cited give countenance to the argument that the rule for which we contended is confined to cases of capture. The reason upon which they go is equally applicable to every other case. The true principle is stated by Kent, Ch. J. in *Schieffelin* v. *New York Ins. Company.*(u) It may be that the property restored is in such circumstances as not to take away the right to abandon ; but they must be peculiar, and the exceptions very few under our adjudged cases.

Abandonment is, in all cases, founded on an inability to proceed in the voyage. There is no reason, in any case, for turning a partial loss into a constructive total one, except the probability that the vessel will, in the end, be actually lost. If she is restored and in the act of earning freight, the only object as it respects the vessel, why should the owner be allowed more than a compensation to the extent of his actual loss ? This principle runs through, and connects all the cases on the subject of abandonment.

The distinction between an absolute and constructive loss is well settled ; and familiar to every lawyer. Strictly speaking, there cannot be a total loss without an actual destruction of the subject, or a divesting the property by condemnation. This strictness would, however, be hard ; because, though not actually lost, it may be in such a condi-

ALBANY, Feb. 1825.

Dickey
v.
Insurance Co

(q) Phil. on Ins. 436, &c.
(r) 10 East, 329.
(s) 2 Burr. 680.

(t) 2 Dow, 474, 482

(u) 9 John Rep. 21, 26.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

tion as will probably result in a loss ; and it would be unreasonable and hard to drive the party to an actual experiment. He is, therefore, allowed to abandon, while the probability exists. So capture will probably lead to condemnation ; and, upon the same principle, the assured may abandon before waiting to hear the sentence. It was to provide for these and the like cases, that the insured is allowed to disentangle himself from a losing speculation, by throwing the risk on the underwriter. These cases are usually either capture, shipwreck, or any combination of facts showing that the voyage is not worth pursuing ; and the two questions always present themselves, is the vessel in the possession of the owner ? And is she capable of pursuing her voyage ? On capture, restoration is contingent ; and stranding and shipwreck do not always give the right to abandon. The vessel is for the time disabled ; but if she be restored immediately, she should be repaired ; and the shipwreck or stranding should be such that a total loss may be calculated on, or a loss of the voyage expected from the delay. The class of cases which have created the greatest doubt and difficulty is the last. Most of the cases I have already cited are to this ; and though some of them deal in generalities, and may admit of equivocation, yet, in their progress, they have disentangled themselves from every subtility and settled down upon the plain simple practical rule for which we contend.

The master's being agent for the assurer depends on the inquiry whether the abandonment was properly made, and to say he was agent in this case begs the question. Till abandonment, he is the agent of the assured only.(v) After abandonment, he becomes the agent of the assurers ;(w) but this is always on the ground, that the abandonment is effectual, as being warranted by the facts existing at the time it is made.

It is said, on the authority of Ashurst, J.(x) the master's act cannot prejudice the right to abandon ; but it cannot be possible that he ever intended to be understood in the sense contended for. It would go to the extent, that if the loss were once total, it must always remain so, though the master by his seasonable exertions, and in the exercise of a most im-

(v) Phil. on Ins. 407, 468. Jumel v. The Mar. Ins. Co. 7 John. Rep. 423, 4.
(w) Id.
(x) 1 T. R. 608, 613, 614.

perious duty, had changed its character into a loss slightly partial. Take the case of a capture, and an immediate ransom or compromise by the master ; was it ever asserted or supposed, that this does not take away the right to abandon ? In that case he restores by money ; in another by repairs. And are not both cases the same in principle ? They are also the same upon authority.(y) If, in any case, the master is agent for the assurer before abandonment, it is in the case of a plain total loss, by which the voyage is palpably gone. In that case he acts for those concerned ; but while he is engaged in the prosecution of the voyage, or with a view to its prosecution, he is always the exclusive agent of the assured.

If the right to abandon depended wholly upon the amount paid for the expenses of repairs, &c., true it would be perfect, without regard to the time or the state of the vessel, though fully repaired by the owner himself, and engaged in the prosecution of the voyage. No reason could exist against making his election by the ultimate amount of repairs determined on actual estimate ; yet the cases are uniform that he cannot do this ; that he has an election either to abandon or repair; and cannot do both.(z) This class of cases is alone conclusive.

Again: the assurer has a right to repair and put the ship on her voyage. This also takes away the right to abandon :(a) and to this there are a series of authorities, which cannot be shaken. If this right does not arise from the nature of the contract, the insurer may always make it a part of the policy by express provision, and issue general instructions to repair.

An abandonment should, at any rate, always be made while the loss exists, in order to enable the assurers to determine whether they will repair what becomes their own property in virtue of the abandonment.(b) It is the assurers, not the master, who are to determine this question. There is good reason why this should be so ; the assurer has nothing to do with the cargo ; and he will always guide himself by his own interest as owner, if the property devolves on him. If the cargo be lost, he may not repair.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

(y) Parsons
v. Scott, 2
Taunt. 370.

(z) Martin v.
Crockatt, 14
East, 465.
Thompson v.
The R. E. Ins.
Co., 1 M. & S.
30, per Ld. El-
lenborough.
Wood v. The
L. & K. Ins.
Co., 6 Mass.
Rep. 482, per
Parsons, J.
(a) Hamil-
ton v. Mendes,
2 Burr. 1209,
per Ld. Mans-
field. Dacosta
v. Newnham,
2 T. R. 407.
Seton v. Del.
Ins. Co., Con-
dy's Marsh.
562, note (92.)
5 Sergt. and R.
509.
(b) Martin
v. Crockatt, 14
East, 465.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

So, where in any case the freight will not be enough to in demnify him.   Whereas, if the owner of the vessel be also owner of the cargo, he may lose sight of the interest of the underwriters upon the ship, in his attention to the cargo. Though the freight may be inadequate, yet he may repair and charge the underwriter with the loss.

If the right rests in the amount of money paid, why has it never been applied to any other case ?   Why not to capture and ransom ?  Is any trace of the doctrine to be found in such cases ?   There must have been frequent opportunity to apply it ; yet it never was insisted on.   The expense of repairs to one-half is, in truth, in all cases mere *prima facie* evidence of incapacity to proceed on the voyage.

It is said the vessel was not restored beneficially.   Suppose this, for the sake of the argument, to be so.   If the ground of abandonment, for which we have contended, be the true one, it is immaterial, whether the bond upon the cargo would affect the vessel, or whether it would not. If properly borrowed, the underwriters are accountable for it, with marine interest ; but no case shows, that a mere lien is good cause of abandonment, or can be insisted on as an actual total loss.   There was such a lien in *Da*

(c) 2 T. R. 407.

*Costa* v. *Newnham ;*(c) but it was not noticed as a ground of abandonment, either by the counsel or the Court.

But was there a lien ?  If the master borrows money, on his own credit, a lien accrues to him ; if he sells a part of the cargo, the proprietors of the goods sold have a lien ; or the lender may have a lien, if he loan on the credit of the ship ; but this is where he has taken no other security.   Here no lien accrued ; none was left to be implied ; for the debt was secured by an express contract.   There are various

(d) Code de Com. Art. 193.
(e) Code civil, B. 3, ch. 5, s. 2.
(f) Id.
(g) Poth. on Obl. ch. 2.
1 Evans' Poth. 260.

modes, by which a lien may be extinguished.(d)   Novation is one ;(e) the substitution of a new debt or a new debtor.(f) Here the master and owner might have been bound ; but taking a respondentia bond extinguished all implied liability.(g)   The implied lien of the civil law, is like one at the common law.   A security by bond or express contract destroys it.

If, however, it existed at all, it was in favor of the owner of the cargo, of whom the plaintiff was the principal one; and he also owned the ship; and to give him a lien over, would be to say that one may have a lien on his own goods. If the abandonment had been effectual, and the ship transfered by it to the underwriters, a lien might then have existed in the hands of Dickey. The claim, as it now stands, assumes that an abandonment was well made; that this created the lien; and then, that the lien thus created goes back and forms a cause for the abandonment; thus reasoning in a complete circle.

*G. Griffin,* (same side,) also argued against the distinction insisted on by the counsel for the plaintiff between abandonment in case of capture, and other cases; and he cited *Church* v. *Bedient,*(h) *Hallet* v. *Peyton,*(i) *Penny* v. *New York Ins. Co.*(j) and *Schieffelin* v. *N. York Ins. Co.*(k) *Adams* v. *Del. Ins. Co.*(l) *Marshall* v. *The Del. Ins. Co.*(m) *Alexander* v. *Baltimore Ins. Co.*(n) and *Smith* v. *The Universal Ins. Co.*(o) as settling the rule that the ·ights of the parties depend upon the state of facts; not the information at the time of the abandonment. He said, in the late digest of the Reports of Pennsylvania,( p) several manuscript cases are collected as supporting the rule, which is thus laid down: "It is *the actual state of things,* at the time of the abandonment; and not the state of the party's *information,* that decides the validity of the abandonment." No distinction is made between capture and any other cause. Phillips concedes that the weight of authority in support of the rule is irresistible.(q) What reason is there for confining the rule to capture? If a restoration in that case oust the right to abandon, why not in others? An embargo or blockade are good cause to abandon while they continue; but on raising them the cause ceases. So of a sunken vessel, as in *Shaw* v. *Felton.*(r) While she is in this condition, no doubt the owner might abandon; but. suppose, before the abandonment takes place, she is raised and the hole in her bottom repaired, is not the right gone? It is one of the excellencies in the law of insurance, that it is not bound down by technicalities. The principle there, at least, is

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

(h) 1 Cain
Cas. Err. 21.
(i) Id. 28.
(j) 3 Cain.
Rep. 155.
(k) 9 John
Rep. 437.
(l) 3 Binn.
287.
(m) 4 Cranch,
202.
(n) Id. 370.
(o) 6 Wheat.
185.
(p) Whart.
Dig. 333, Insurance, H. (c)

(q) Phil. on
Ins. 436-7.

(r) 2 East,
109.

ALBANY,      universal, that when the cause ceases, the effect ceases.  In
Feb. 1825.   *M'Masters* v. *Schoolbred*,(s) damage and repair to £60,
Dickey       per cent. were mixed up with capture, yet the restoration
v.           was held to take away all right to abandon.  *Humphrey* v.
Insurance Co. *Union Ins. Co.*(t) is in point against the distinction.  The
(s) 1 Esp.   talking about an election to repair is censured as absurd in
Rep. 237.
(t) Phil. on that case ; but it was perfectly proper.  The owner is con-
Ins. 401.    sidered as repairing by the hand of the master, his agent ;
and the Judge goes upon the maxim *qui facit per alium, fa-
cit per se.*  Even the bottomry bond on which the vessel
was sold was not allowed to vary the principle of abandon-
ment.  This is always, either because the loss, *prima facie*,
breaks up the voyage ; or because there are not sufficient
funds to repair.  The presumption and the want of funds
are met and repelled, in this case, by the fact of repairing.
We offer to pay all that has been expended, and, in honesty,
the assured can ask no more.

It is said the captain was the agent of the underwriters,
or that, if not so, he had no power to change a total into a
partial loss.  Both the position and corollary are negatived
(u)  C.  C.  by *Doederer* v. *Del. Ins. Co.*(u)  That case adjudges, that
April, 1807, the captain continues the agent of the assured, after capture,
M. S. Whart.
Dig. 337, In- until the abandonment is made, and may, as such, prejudice
surance  H.
(f) pl. 182. him by his acts ; that he is the agent of the insurer, only
Condy's      when he acts for the benefit of all concerned.  Then when
Marsh. 534 b,
S. C         does the transition of character occur ?  Plainly when the
relation is changed by a valid abandonment, which presup-
poses a state of facts justifying it at the time.  A deduction
can not be made to fortify the premises.  The plaintiff has
attempted this ; and literally seizes on the conclusion to
fortify his major proposition.  Remaining the agent of the
assured, is the captain to be taught by him not to touch the
vessel by repairing the injury done by storms, ransoming
from capture, or raising a sunken ship, for fear of changing
a total into a partial loss?  Is not this a monstrous doc-
trine ?  His duty, as settled by law, is directly the contrary ;
and he has faithfully pursued it in this instance, on con-
sultation with, and under the direction of surveyors, who
recommended the repairs.

It is said, here is a lien, and the French code is relied on ;(v) but the law is universal, that when one is entitled to an implied lien, it is waived by entering into a special contract to secure it. His remedy must be confined to his special contract; and his lien is gone forever.(w) This doctrine is derived from the civil law, on which the continental systems are based.(x) Instead of relying on the general law of lien, a respondentia bond is given, and is confined in its effect to the particular articles mentioned in it.(y)

But this lien was never enforced. The vessel proceeded to her home port with her cargo, where the bills were all finally discharged, or might have been so, out of Dickey's own funds, by his consignee. The vessel was not stopped one moment. The lien is a mere phantom conjured up to convert the loss from a partial to a total one. A lien or peril on paper, or in mere name, is no ground of abandonment. A substantial injury should arise. In *Humphrey* v. *The Union Ins. Co.*(z) there was a bottomry bond, not merely on the cargo, but the vessel itself; and yet it was denied as a ground of abandonment.

But it is enough for us that this lien was not set up as the foundation of an abandonment in the letter of Dickey. The law is well settled that you cannot abandon generally : but must put your finger on the cause, and point it out specifically.(a) The latter cannot be eked out, and made to meet this cause by construction. The plaintiff should have told us of the lien in terms and by name. He did not do it, because he did not dream of its being an injury; and we hear nothing of it in the voluminous evidence of the master.

[The counsel for the defendants also examined the items of expense, and contended that the repairs in question did not cost one-half the ship's value.]

*T. A. Emmet*, in reply. Our case is far from being one of the first impression. I think we shall show it already decided, or, at least, dependent on old principles. We rely on *Goss* v. *Withers*,(b) *Hamilton* v. *Mendes*,(c) and *Mills* v. *Fletcher*.(d) The rule laid down in these cases has been

---

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

(v) Code de Commerce, Livre 2, tit. 1, Art. 190, 191.
(w) Bull. N. P. 45. Cowell v. Simpson, 16 Ves. 275.
(x) And vid. Code de Commerce, Art 320.
(y) Id.

(z) Phil. on Ins. 401.

(a) Sudam v. Mar. Ins. Co., 1 John. Rep. 190-2. id. 138, S. C.

(b) 2 Burr 683.
(c) Id. 1198.
(d) Doug 231.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

(a) Evans'
Essays, 53, tit.
abandonment.
Park on Ins.
194, tit. aban-
donment.

(b) 11 John.
Rep. 315.

(c) Marshall
on Ins. 559,
560.

(d) Parsons
v. Scott, 2
Taunt. 363,
373, per Law-
rence, J

(e) Hamil-
ton v. Mendes,
2 Burr. 1198.

highly approved by the ablest writers on commercial law ;(a) and the decisions of our own courts founded on them, leave no room to entertain the later cases opposed to them. ·

We admit the general position, that insurance is a contract of indemnity ; but to attain this, the law has adopted a general rule applicable, without farther examination, to all cases attended with certain circumstances. The familiar case of deducting one-third new for old, in case of sea damage, is one example under that rule, which, in *Dunham* v. *Commercial Ins. Co.*(b) was adhered to, for the sake of preserving it unimpaired, even at the expense of manifest injustice. Another rule of the same character is, that under certain circumstances, the assured may abandon, and claim for a total loss, which comes within the conventional rule of indemnity ; and goes upon the idea, that no measure can be established to reach every case. In these cases, the assurer is not allowed to controvert the rule, by saying that an adjustment, as for a partial loss, will give an indemnity.(c) This is an old rule, ingrafted in the commercial code of every country ; and recommended as well by the highest equity, as the most universal adoption.

But the application of the rule to this case is denied ; and gentlemen would confine its operation to certain cases of reason and justice which they suggest. One of the gentlemen says, it is founded on the presumed innavigability of the ship, and on this, his whole argument is founded. A little reflection would have taught him otherwise : for the rule applies as well to goods as ships, of the former of which innavigability cannot be predicated.(d) The rule begun with goods ; and if afterwards extended to ships, as being in *pari ratione*, the reason must be sought in something not applicable to ships. Different rules apply to each. Several cases will warrant the abandonment of a ship, which will not apply to goods ; and they sometimes complicate to such a degree, as makes it difficult to say, when they do apply to the one or the other. The three cases from Burrow and Douglass, decided by Ld. Mansfield, establishing the rule, that " if the voyage be lost, *or* not worth pursuing,"(e) which is wrongly put in the conjunctive, " lost *and* not worth pur-

suing, in *Falkner* v. *Ritchie*,(*f*) does not apply to both cases, but must be taken distributively, and in reference to two different situations of the ship. *The loss of the voyage* alludes to the innavigability of the ship ; the *not being worth pursuing*, the damage it has received, though it may still continue navigable. In these two senses it is considered by Buller, J. in *Mitchell* v. *Edie*,(*g*) and by Ld. Ellenborough, in *Thompson* v. *The R. Exch. Ins. Co.* ;(*h*) and the distinction is highly reasonable and derives countenance from several other books.(*i*)

According to these authorities, where the ship is damaged to one-half its value, the voyage ceases to be worth pursuing. To make a distinction between individual instances, would be inconvenient, as opening a door to management and fraud. To avoid this, the law generalizes, declaring that the loss of one-half, accompanied by an abandonment, shall, in themselves, constitute a technical total loss. It sets up a positive rule, and will not allow the reason and fitness of the thing to be examined, with a view to each individual case. If the objection in this case, that a plaintiff, in honesty, can ask nothing more than an estimate of, and allowance for his apparent loss, have any weight, it is an argument against the rule *itself*, and not a case coming within the rule. The same remark was made in *Hamilton* v. *Mendes*, but it was misdirected, if meant to be pointed at the rule. The case was one of capture and immediate re-capture, with little or no damage ; and for what little damage there had been sustained, the underwriters had offered to pay. The arguments used in that case by Lord Mansfield, are introduced *into almost every* discussion arising upon a claim for a technical total loss ; but they never apply ; for in that case it had not happened.

[He examined the facts in the case under consideration, and insisted that the real loss was much more than one-half the value of the ship ; and that a recovery as for a partial loss would not amount to a complete indemnity ; that there are several items always contemplated in a valid policy, and among others the great delay, which could

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

(*f*) 2 M. &
S. 293.
(*g*) 1 T. R.
615.
(*h*) 1 M. &
S. 30.
(*i*) *Rhinelander* v. *Ins. Co. of Penn.*, 4 Cranch, 45. Weskett on Ins. tit. abandonment, s. 23. *Hamilton* v. *Mendes*, 2 Burr. 1201, per Aston, *arguendo*, adopted *in hæc verba* by Park on Ins. 194.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co.

(*j*) 1 Dow,
349.
(*k*) 2 id.
474.

not be covered by estimates upon the principles of a partial loss; and with a view to which the plaintiff should, in honesty and fairness, recover as for a total loss to the extent of the valuation in the policy.]

True, it was intimated in *Brown* v. *Smith,*(*j*) and *Smith* v. *Robertson,*(*k*) that delay of the voyage does not form a ground of abandonment of the ship; but it clearly comes in aid of the rule that the assured may abandon when the voyage is not worth pursuing.

We are told that the abandonment was too late; that it should relate to the state of facts at the time of the abandonment; and that repairing and proceeding upon the voyage turned a technical total loss into a partial one. I do not intend to examine the question whether the right to abandon depends on the state of facts, or information, at the time it is attempted; because, according to the view which I have taken, the facts were never so much altered as to deprive the plaintiff of that right. Nor do I feel authorized, after the decisions of our Courts upon the subject, to contend that the state of information is to govern. Different opinions upon the question have, however, existed among great men; and I do feel warranted in saying, that where facts are urged to do away the state of the information, they should be clear beyond all doubt, and the alleged alteration of circumstances should be closely scrutinized. This is required by the state of this commercial country, trading extensively to the most distant parts of the world, our merchants being, for months together, in the greatest uncertainty as to the fate of their adventures. It was natural to say, that where the facts are plainly and entirely changed by a sudden re-capture, or the speedy raising an embargo, the party should be holden to the state of facts. Such an event often leaves but little trace of damages behind; and Story, J. means no more than this in *Smith* v. *The Universal Ins. Co.*(*l*) Even in case of capture, if the salvage exceed one-half the value of the ship, a restoration will not divest the right to abandon. This may be clearly gathered from the cases cited, decided by Ld. Mansfield. And there is a marked difference which should lead to a more careful preserva-

(*l*) 6 Wheat.
186.

tion of the right in the case of sea damage. Where there is a capture, the insurer pays the whole amount of damage sustained ; while in that of sea damage, he comes off by paying 2-3 of it, under the rule which deducts 1-3 new for old. In the case of *M'Masters* v. *Schoolbred,*(m) relied on as one illustration by gentlemen, there was no abandonment ; and, of course, no question was, or could be raised, whether there was a technical total loss. Had there been an abandonment, it is plain, from the opinion of Ld. Kenyon, that it would have been sustained, and an attempt was made to show an offer to abandon. Beside, if *Bainbridge* v. *Neilson,*(n) relied upon by gentlemen, be law, *M'Masters* v. *Schoolbred,* as understood by them, is overruled. If it is still to be regarded as authority, it supports the rule for which we contend. There was no abandonment in *Da Costa* v. *Newnham,*(o) and there does not appear to be a loss of 50 per cent.

The utmost that can be said of the power of the captain over the rights of the parties, is, that he is the agent of all concerned.(p) He has no power to control the assured's right of abandonment. If he succeed in diminishing to less than 50 per cent, or entirely removing the damage, the underwriter may well have the benefit of this ; but if he merely change the character of it, his act has no effect between the parties. He cannot take away the election of the assured. The rule giving a right to this election is a positive one ;(q) and the reason applies with just as much force after the captain has completed the repairs as before.

Applying the funds of the owner towards the repairs does not diminish the injury. Nay, they make a loss which renders the voyage not worth pursuing; and come to the same thing as if they had never been done. The underwriters cannot say that, for a loss of 50 *per cent,* the assured shall not abandon and convert it into a total loss. We have seen the rule, that he may do so, is precise, technical and positive. The repairs merely change one prospective damage into another. They merely substitute new debts due to people other than the assured. The debt due from the underwriters was in truth just as much when the vessel left Port Louis, and was proceeding on her

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

(m) 1 Esp
Rep. 237.

(n) 10 East,
329.

(o) 2 T. R.
407.

(p) *Mitchell*
v. *Edie,* 1 T.
R. 608, 613,
14. *Jumel* v.
*The Mar. Ins.
Com.,* 7 John.
Rep. 412, 423,
per Kent, Ch.
J.

(q) *Smith* v.
*Bell,* 2 Cain.
Cas. Err. 153,
157, per Lansing, Chancellor.

ALBANY,  voyage, as when she was wrecked there; and in *Ralston*
Feb. 1825.  v. *The Union Ins. Co.*(r) the very point decided was, that

Dickey  where the loss is more than 50 *per cent*, the assured may
v.  abandon, even after the vessel has been not only repaired,
Insurance Co.  but has reached her port of destination. In *Peters* v. *The*
(r) 4 Binn.  *Phœnix Ins. Co.*(s) the same point was decided; and in
Rep. 386.
(s) 3 Serg. &  *Coolidge* v. *The Gloucester Mar. Ins. Co.*(t) it will be
Rawle's Rep.  seen by a comparison of the dates, that the assured was
25.
(t) 15 Mass.  allowed to abandon after the ship was fully repaired. In
Rep. 341.  the case of the Argonaut,(u) lately decided by Judge Sto-
(u)     Pam-  ry, the same doctrine is held by him; and he denies that
phlet.
(v) 2 B. &  *Thornly* v. *Hebson*(v) is law. This last case, decided by
A. 513.  Judge Story, is in contradiction to *Humphrey* v. *Un. Ins.*
(w) P. 401.  *Co.* said to be decided by him in Phillips on Insurance.(w)
          As to the lien; the Code de Commerce, 190, 191, speaks
the marine law of the world, if we except England, where
her courts of admiralty have been restrained in the exercise
(x)     Abbott  of it.(x) Nor is it necessary to inquire whether our district
on     Shipping,  Courts would allow a recovery upon the lien. In every
135 6, &c.
other country, the ship is bound to make good the loss of
the cargo, arising from its being appropriated to repairs;
and the lien may be enforced by a proceeding *in rem*, with-
out regard to the question who owns the ship or who
owns the cargo. Admit what is contended, that by the
320th article of the Code de Commerce, the borrower can-
not, after taking the respondentia bond, have recourse to
the ship, but is confined to his remedy against the cargo;
as soon as he goes to the cargo, the owners of this may
go to the ship. It comes indirectly to the same thing.
The loss is removed but one step; and it is not material
whether the captain or consignee has the right of lien.
If the ship is bound by it, some one has it; and its exis-
tence is the only point. The same argument answers the
objection of novation or substitution. The effect of the
respondentia is a direct lien upon the ship, as if she had
herself, in the first instance, been bottomed for the expen-
(y) Phil. on  ses. *Humphrey* v. *Union Ins. Co.*(y) is relied on; but this
Ins. 401.  goes upon the idea of an election to waive the abandonment;
by the owner's direction to repair. Here was no such direc-
tion. So long as the lien exists, the ship cannot be consid-

ered as restored. This idea is maintained by *Da Costa* v. *Newnham* ;(z) and *Smith* v. *Williams*(a) decides that bottomry upon a ship takes away the insurable interest *pro tanto*.

It is said the plaintiff had funds at Antwerp, by which the ship was or might have been relieved ; but the right to use those funds in the payment of debts depends on assuming that there was no right to abandon. It is the opposite side, then, that reasons in the entirely vicious circle. The ship, not the plaintiff, was the debtor. Had not the plaintiff appropriated his funds to pay debts, the ship must have been sold for this purpose at Antwerp. But the debts to be paid at Antwerp were, in truth, the debts of the underwriters. It was for the very purpose of enabling the plaintiff to avoid the payment of those debts, that the law gave him a right to abandon. This right continued. The rule could not cease to exist when every thing remained in debt; and heavily encumbered. Suppose the plaintiff had sold the whole adventure, how would the parties have bargained ? The amount of the various liens must have been deducted from the value of the ship ; and the balance would have formed the price. Can it be possible that this ship was beneficially restored, when it could not have been sold short of first raising liens to very nearly its value ? In this view, the case is directly within *Goss* v. *Withers*,(b) and *M'Iver* v. *Henderson*,(c) which leaves the law where *Goss* v. *Withers* had placed it ; and obviates every part of the objection taken. The case of *Patterson* v. *Ritchie*(d) is also with the plaintiff upon this point of lien. Indeed, substitute *sea damage* for capture, and it is precisely the case.

WOODWORTH, J. This is an action on a valued policy for $10,000, on one-half the ship Frances Henrietta. On the 7th of March, 1819, the vessel put into Port Louis, in the Isle of France, in distress, where her cargo was taken out; and she was afterwards repaired, at an expense exceeding half the value. On the 28th June, the vessel having been repaired, sailed for a port in Holland, and arrived at Antwerp on the 1st of October following. On the 6th July, 1819, the plaintiff abandoned his interest to the defendants, and claims to recover for a total loss.

ALBANY,
Feb. 1825.

Dickey
v.
Insurance Co

(z) 2 T. R. 407.
(a) 2 Cain Cas. Err. 110

(b) 2 Burr. 683.
(c) 4 M. and S. 576.
(d) Id. 393, 396, per Ld Ellenborough.

The first question is, whether the state of facts as they ex. isted at the time of abandonment, or the supposed state of things at the time, must govern in deciding whether there has been a total or a partial loss.   On this point it seems to me, that as well the nature of the contract, as the authority of adjudged cases, require us to adopt the former.   For the purpose of establishing a uniform rule, the assurer is liable for a technical total loss, if the repairs exceed one-half the value of the ship, and this can never be turned into a partial loss, if the insured abandons before the repairs are made. His right is *stricti juris*, and may be enforced, although it may turn out that the ship was subsequently repaired, and proceeded on her voyage.   The construction of the contract binds the assurer in such a case.   He must then do the best he can with the property thrown on his hands.   The mea-. sure of indemnity, thus far, is well defined and certain; but a very different case is presented, when that which at one time gave a right to abandon had ceased to exist; when the inju ry on which the right is founded has been repaired; and the vessel in every respect as capable of performing the voyage as before any damage was sustained.   It would be repugnant to consider the loss total, when the final event has decided that it is partial.   If the peril be over, and the subject insur- ed in safety, the assured cannot elect to abandon, because he has no right to abandon when the thing is safe.   (Park, 209.)   On this principle of the law of insurance, the real state of facts must be the criterion to determine to what ex- tent the assured has a right to recover.   If the information received is to govern, this principle is subverted, and the re- sponsibility of the underwriters greatly enlarged.   In the words of Lord Ellenborough, (10 East, 341,) "it would be to make them answerable, not for the actual loss sustained by the insured, whom they have undertaken to indemnify, against the risks stated in the policy, but for a supposed to- tal loss, which had in fact ceased to exist."   The question is well settled on authority.   In *Church* v. *Bedient*, (1 Caines' Cases in Error, 21,) it was held, that on a capture, restoration and abandonment, the fact of restoration, though unknown at the time of abandoning, takes away the right of abandon-

ment and claim for a total loss. It was there considered, that, from the mere act of abandonment, no positive right could be derived to the insured, unless it be combined with total loss. If, in the final event, it should prove an average loss, the act of abandonment would be nugatory.

This reasonable principle was sanctioned by the Supreme Court of the United States, in the case of *Rhinelander* v. *The Insurance Company of Pennsylvania.* (4 Cranch, 29.) The question was also decided in 4 Binney, 287. The Court there held, that there is nothing in the nature of the contract, from which it may be inferred that the rights of the parties are to depend upon supposed losses.

We must then look to the state of things at the time of abandonment. The voyage was not broken up; the vessel had been repaired, and was on her way to the port of destination ; the technical total loss did not continue to the 6th July, 1819. The plaintiffs had been placed in the same situation, in respect to the vessel, as they were before the injury happened. She arrived safely at Antwerp. The plaintiff's case is one that may frequently happen, when the damage is sustained at a great distance from the assured. Months pass before information can be received. In every case where there is information of a technical total loss, it is advisable to elect to abandon, if the assured wishes to cast the property upon the underwriter. It may, or may not become effectual ; but it places the assured in a situation to make the loss total, upon the contingency that the state of facts correspond with the information received. Why should it be otherwise? Indemnity is the object; and that is obtained, if the insurer pays the damages for repairs.

Where the technical total loss continues, it is true, that more than an indemnity may, in many cases, be recovered. For the sake of a uniform rule, this consequence is sometimes unavoidable. In that particular instance, the general nature of the contract is made to yield to the greater benefit derived from an inflexible rule ; but when the case does not come strictly within it, when the vessel is in the same, or perhaps in a better state than before the injury, it would change the contract of insurance from its original object, in-

demnity, to allow the insured to abandon, and in this manner protect himself for depreciation in the value of the vessel, or the consequences of an unfavorable market. But it is contended that the vessel was not beneficially restored, and therefore the loss continued. That will depend on the question, was there a lien on the vessel? Undoubtedly the assured has a right to claim, that his possession shall be absolute and perfect. He is not bound to relinquish his claim for a total loss, if in reality there is a lien or incumbrance attached to the vessel. But the abandonment was not put on this ground; it is stated to be in consequence of the disaster, and the great injury to the voyage. In making the abandonment, the assured must assign the true causes. If he assign an insufficient cause, he is bound by it, and cannot avail himself of a subsequent event, without a new abandonment. This was so held in *Suydam and Wykoff* v. *The Marine Insurance Company*, (1 John. 181.)

The master paid for the repairs at the Isle of France. In doing this, besides selling a part of the cargo, he was obliged to borrow money on respondentia, on the cargo. The vessel was not pledged for the payment. She must therefore be considered as beneficially restored; no impediment was placed in the way of prosecuting the voyage to a successful termination.

The plaintiff, then, is entitled to recover for a partial loss only. In adjusting this loss, the defendants must pay the amount expended for repairing the ship, with interest, deducting one-third new for old; and also the difference between the amount of sales of a part of the cargo, at St. Louis, for the purpose of repairing the ship, and what it would have produced at the port of delivery in Europe, together with marine interest on that part which was pledged; the residue of the expenses at the Isle of France to be settled as general average, to which the vessel, freight, and cargo are to contribute; the defendants paying the ship's proportion of general average.

SUTHERLAND, J. concurred.

SAVAGE, Ch. J. The important question is: Had the plaintiff a right to abandon when the offer was made?

To decide this question correctly, it is necessary to inquire,

*First.* Whether the repairs at the Isle of France exceeded a moiety of the value of the ship, so as to constitute a technical total loss?

*Second.* Whether that loss continued total at the time when the offer to abandon was made?

*Third.* Whether the plaintiff lost his right to abandon by repairing?

1. It is perfectly well settled, that if the ship be injured by any of the perils insured against, and the repairs will cost more than half the value of the vessel, the injury amounts to a technical total loss, and the insured may abandon. (Phillips on Insurence, 401, and cases there cited.)

It becomes necessary to ascertain the amount of the repairs, as it is denied that they did amount to half the value of the vessel; and I shall state what items of expense at the Isle of France, I consider as belonging to repairs. By the case of *Dupuy* v. *The United Ins. Co.* (3 John. Cas. 182,) it seems that the agent's commissions might be properly included in the estimate of repairs. But in this case the expenditure for repairs, rejecting commissions, exceed half the value. Take the following items:

| | |
|---|---|
| Copper Nails, | $861 42 |
| do. | 425 25 |
| Rope, Hemp, &c. | 139 17 |
| Oil, | 8 00 |
| Ship Chandlery and Cable, | 1,085 23 |
| Ship Carpenter's Bill, | 14,444 72 |
| White Lead, | 42 00 |
| Old Junk, | 10 00 |
| Cables, | 345 00 |
| | $17,360 79 |
| Deduct old Copper, | 1,464 09 |
| | 15,896 70 |
| Deduct one-third, | 5,298 90 |
| Amount of repairs, | $10,597 80 |

rejecting several items properly chargeable to the ship.

The repairs, therefore, have exceeded half the value of the vessel, as valued in the policy; and it is not pretended that the value was greater at the port of necessity.

2. But it is contended, that as the vessel was actually repaired, and on her voyage, when the offer to abandon was made, it is like the restitution of a captured vessel, which being restored before abandonment, the right to abandon is lost.

It is well settled that the right to abandon depends on the state of facts existing at the time the offer is made, and not on the information of the assured; and it is equally well settled, in cases of capture, that if, before abandonment, the vessel is restored, the underwriter is not liable for a total loss, unless the voyage be lost, or not worth pursuing, or the salvage exceed half the value. So far as an analogy exists, in this case, to cases of capture, is there any thing equivalent to restoration? The vessel, indeed, was afloat, and in the prosecution of her voyage when the assured offered to abandon; but under an incumbrance exceeding half her value; and therefore was not restored. There can be no doubt, that the master had the right to sell a part of the cargo, in case of necessity, and to borrow money upon bottomry or respondentia; and, in this case, I understand the law to be, that the vessel was bound to indemnify the cargo against the respondentia bond. This respondentia, and the expenses paid by the sale of the cargo, constituted such an incumbrance upon the vessel, that the owner cannot be said to have his ship restored to him. Would a captured ship be considered as restored by being returned to the possession of the assured, subject to the payment of salvage, exceeding fifty per cent. of her value? On the other hand, it is said, that it never can be proper to convert a partial into a total loss; that all the assured can ask, is indemnity; and all the insurers ought to pay, is the amount of the plaintiff's loss. If, therefore, the defendants pay the plaintiff his expenses in procuring the restoration of his vessel, what more can he ask? Had the defendants, by an agent at Port Louis, made the necessary advances for the repairs, and the vessel had thus been restored to the plaintiff, without any sacrifice on

his part, would he then have had a right of abandonment? And if not, would the offer of the defendants, to pay all those expenses and losses, as soon as informed of them, re-put any claim or right of the plaintiff to abandon. These questions are answered by Mr. Justice Story, who says, the offer to repair has never been relied on to defeat an indisputable vested right to abandon: but an offer to bear all expenses is a proper ingredient, in considering whether the owner has a right to abandon. (*Peel* v. *Merch. Ins. Co.* Phil. on Ins. 407.)

In my judgment, the plaintiff had a right to abandon, unless, by repairing the vessel, he signified his election not to do so.

3. This point has been decided by Mr. Justice Story, in *Humphrey* v. *Union Insurance Co.* (Phil. on Ins. 401, U. S. C. C. Mass. May, 1823.) In that case, a ship from Messina to Boston, sustained sea damage which made it necessary to put into Lisbon, where she was repaired by the master, at an expense exceeding half her value; and the vessel was bottomed for the expense. The owner abandoned, on hearing of the accident, which was only a few days before the arrival of the vessel at Boston. Proceedings were instituted on the bottomry bond, and the vessel sold; but the sale did not produce enough to satisfy the bond. It was held that this was a partial loss; and that the assured, by electing to repair, had lost his right to abandon.

This is a case exactly in point; and if it is received as authority, decides the one now under consideration. I find no case, exactly in point, decided the other way, though there are both cases and principles which seem to lead to a different conclusion. A state of things must often occur in which it becomes necessary for the master to act without consulting the owner. The accident may happen, as here, at a distance, which renders such a communication impossible. It then becomes the duty of the master to act; and in *Milles* v. *Fletcher*, (Doug. 231,) Lord Mansfield expressed an opinion, that if the master had acted as would have been right, in case the vessel and cargo were his own, the underwriter must answer for the consequences. Hence,

it would seem to follow, that it depends on the propriety of the course adopted, whether the master acted as the agent of the plaintiff or defendant; and that if it was for the benefit of the ship and cargo to repair, then the plaintiff should not be prejudiced by the acts of the master. "Till the assured had been informed of what has happened, and have had an opportunity of exercising their own judgment, no act done by the master shall prejudice their right of abandonment." (*Mitchell* v. *Edie*, per Ashurst, J. 1 T. R. 613.) The master is, therefore, not to judge of the propriety of an abandonment, nor is he the agent of the assured for that purpose.

The language of writers on insurance, and of Courts, in discussing the question whether the assured is entitled to abandon, seems to suppose that an abandonment may be made after the ship is repaired. In the case of wrecks or stranding, how can it be known that the expense of setting the vessel afloat will exceed half the value, until that expense has been incurred? In the case of repairs, generally, the estimates of the surveyors may be relied on; but even should the master know that the repairs will exceed half the value of the vessel, may it not still be proper for him, as the agent of all concerned, to make the repairs? He is not bound to know whether the owner will choose to abandon. The assured is, in no case obliged to abandon. He may do so in certain cases; and he must make his election in a reasonable time after information of the event which gives him the right; but the master is not to calcu late or speculate on what his election may be. It is the master's duty, therefore, to make the repairs, where it would be his interest to do so, were he the owner of both ship and cargo. In the case of *Dupuy* v. *The United States Ins. Co.* (3 John. Cas. 182,) the voyage was from New York to St. Sebastians, and back. The vessel was obliged by a storm to put into Kinsale, where she was repaired at an expense exceeding half her value. It does not appear expressly that she was repaired before she was abandoned; but it may be inferred. On the other hand, it is contended, and with great force, that the abandonment should be made before repairs; that the insurers may elect whether to repair or not; that they may prefer to

sell the stranded vessel for what she will bring rather than repair, when perhaps, as in this case, the repairs may cost more than the vessel, when repaired, will be worth ; and that, as the master is not the agent of the assured to determine whether to abandon or not, so neither should he be the agent of the insurers to determine whether to repair or not, in a case where the amount of repairs may be cause of abandonment.

On this point, the opinion of Mr. Justice Story is entitled to great consideration ; and I am content to take the rule as laid down by him, that the assured can in no case abandon after making repairs ; that by electing to repair, he loses his right to abandon.

This rule is supposed to be most consonant to the contract of insurance, and the principles of justice. It has been doubted by very learned jurists, whether an abandonment ought ever to have been permitted in any case. (Vid. *Mitchell* v. *Edie,* per Buller, J. 1 T. R. 608, 615, 616.) It is now too late to discuss that question ; but in a case where the right is not supported by any express adjudication, and is denied by such respectable authority ; and when we have the authority of Lord Mansfield for saying, that "in late times the privilege of abandonment has been restrained for fear of letting in frauds," (2 Burr. 697, id. 1213,) we shall be justified in adopting the rule as laid down in *Humphrey* v. *The Un. Ins. Co.*

In my opinion, therefore, the plaintiff is entitled to recover for a partial loss only.

**Judgment accordingly.**