## JEREMY PERKINS *vs.* AUGUSTA INSURANCE AND BANKING COMPANY.

A vessel was insured " at and from New York to Gibraltar, and at and from thence to Tarragona, with liberty of using one port (European) between Tarragona and Gibraltar, and at and thence to New York." Four months after, this memorandum was indorsed on the policy: " Permission is given to stop at one other port between Tarragona and Gibraltar, paying one fourth additional premium if liberty is used." *Held,* that this gave permission to stop between Tarragona and Gibraltar upon the homeward voyage from Tarragona, but not to stop at Gibraltar also.

A policy of insurance on a vessel is not avoided by her going out of her course to obtain necessary medical assistance for the captain's wife; and the question of the necessity is for the jury.

Taking on board water and additional cargo, at a port into which a vessel has gone to obtain necessary medical assistance, does not avoid a policy of insurance on the vessel, unless it increases the delay or the risk.

A letter of abandonment of a vessel upon the ground that, in consequence of sea perils, " being found irreparable on survey, she was condemned and sold," sufficiently states the cause of abandonment, if the vessel was so much damaged that the costs of repair would exceed half her value, deducting one third new for old.

The certificate of a marine surveyor and inspector, made in the course of his business, is competent evidence of the seaworthiness of a vessel at that time, if supported by his oath that he examined the vessel, and that he has no doubt that the facts stated in it are true, although he has no independent recollection of those facts.

A question " whether, if the foremast was sprung, the try-sail split and standing rigging such as to need replacing at " a certain port, " the master would probably have known it? " does not depend on nautical skill, and cannot be put to an expert.

ACTION OF CONTRACT on a policy of insurance, dated April 9th 1851, upon the Brig Josephine, " at and from New York to Gibraltar, and at and from thence to Tarragona, with liberty of using one port (European) between Tarragona and Gibraltar, and at and thence to New York." On the 18th of August 1851 this memorandum was indorsed on the policy : " Permission is given to stop at one other port between Tarragona and Gibraltar, paying one fourth additional premium if liberty is used." Answer, deviation and unseaworthiness. Trial at November term 1854 before *Bigelow,* J., who made the following report thereof:

" It appeared that the vessel left Tarragona on her return voyage on the 22d of July 1851, with a part of her cargo on board ; on the 28th of July put into Almeria and took in a considerable quantity of cargo, remaining there till August 11th ; and on the 16th of August was abreast of the port of Gibraltar.

" The captain testified that his wife, who was on board with the knowledge and consent of the owners, came upon deck to look at the Rock, and on turning to go down the cabin stairs missed her footing, and fell from the top to the bottom, a distance of about six feet; that she was at that time in the third month of her pregnancy; that under the circumstances he felt himself called upon to stop at Gibraltar for medical advice and aid; that he accordingly came to anchor and sent a boat on shore for a physician; that the physician prescribed for her, and under his advice and direction the vessel remained at Gibraltar until August 22d; that while there some new cargo was taken on board; that the vessel left Gibraltar as soon as his wife was well enough; and that the logbook was kept by the mate, and he believed it to be correct."

The entries in the logbook from August 16th to August 22d made no mention of the accident to the captain's wife, but corresponded with his testimony in other respects.

" On her voyage home, the vessel met with a disaster and was abandoned to the underwriters.

" These facts presenting a question of law as to whether the policy was made void by an unjustifiable deviation, the jury were directed by the presiding judge to find a verdict for the defendants, which is to stand confirmed or be set aside, and a new trial ordered, as the judgment of the whole court may be upon the above point of law."

· This question was argued and decided at November term 1855.

*G. S. Hillard*, for the plaintiff.

*R. Choate & J. M. Bell*, for the defendants. 1. The policy either calls for a straight voyage from Tarragona to Boston, touching nowhere, looking to the use of the two ports, to touch at which permission is given, between Tarragona and Gibraltar on the outward voyage; or, if the permission to use the two ports allows their use on the return voyage, it calls for a straight. voyage from the last port visited in accordance with the permission to Boston. Neither of these constructions gives liberty to touch at Gibraltar.

2. The sickness of the captain's wife was no excuse for the

leviation at Gibraltar. Sickness of the crew even, unless so
great as to leave the ship with too small a force to work her,
is no excuse. 1 Arnould on Ins. § 152. *Woolf* v. *Claggett*, 3
Esp. R. 257. The captain's wife had no right, as against the
defendants, to be there; and in this respect the vessel was, as it
were, not properly fit for the voyage; and going out of the course
to procure aid for her was like putting into port for medicine
and medical aid which ought to have been on board, or on ac-
count of sickness of crew, when the vessel was insufficiently
manned in the first instance. The case does not find that her
life was in danger; and even the deviations to save life, which
have been excused, have been to pick up men from other ves-
sels. 1 Arnould on Ins. § 152. 1 Phil. Ins. § 1027. The log-
book shows that the ship did not put into Gibraltar for the sickness
of the captain's wife, but to take in water and wait for cargo.

MERRICK, J. The brig having stopped on her passage back
from Tarragona to the United States, first at Almeria and after-
wards at Gibraltar, the defendants insist that there was a de-
viation in each of these instances by which the underwriters
were discharged from all responsibility on account of subsequent
losses. This is denied on the other hand by the plaintiff, who
contends that the privilege of entering and using each of those
ports on the homeward voyage was secured to him, first by a
clause relating to that subject contained in the policy, and again
by the terms of the memorandum indorsed upon it on the 18th
of August. But neither of these conflicting propositions is fully
warranted as a consequence of any express stipulation or agree-
ment between the parties. The insurance of the brig by the
defendants was upon a voyage, as it is described in the policy,
" from New York to Gibraltar, and at and from thence to
Tarragona, with liberty of using one port between Tarragona
and Gibraltar, and at and thence to New York." But by a
later arrangement between the parties the further permission
was given to the insured " to stop at one other port between
Tarragona and Gibraltar." Considering the manner in which
that permission is expressed, and the time when it was given, it
was obviously the concession of a privilege to be availed of on

the homeward voyage. This is indicated by the order in which the two places constituting the external limits of the space within which it was to be enjoyed are mentioned, and is a reasonable implication from that circumstance. And as Tarragona, which is the extreme point and termination of the outward voyage, is first named, and is therefore to be passed before this right can be exercised, it is a necessary consequence that it must be exercised on the passage of the brig to its homeward port. And that this was the intention of the parties is apparent from a consideration of the time when their agreement was made. The memorandum was indorsed on the policy more than four months after its date, when they could have entertained no reasonable doubt that the whole outward voyage had been accomplished, and that the brig was either then lying at Tarragona, or had already departed thence on her passage back to New York. It is to this part of the voyage therefore that the permission in the memorandum indorsed on the policy is, according to the intention of the parties, to be applied; and it gave the assured the right, of which he availed himself, to put into the port of Almeria. But he had no such right to stop as he afterwards did at Gibraltar. It was not included in the liberty secured to him in the description of the voyage in the policy, nor in the additional privileges which were conceded to him by the indorsement of the memorandum upon it. That place is mentioned in the former clause as one of the points to be touched at, and then to be departed from for Tarragona; and in the latter, as one of the external limits or boundaries of the space within which the liberty of using another port may be availed of. Neither of them recognizes it as a port to be revisited, or to which the brig, after once having left it, might again resort.

But the plaintiff contends that, independently of the rights of the parties, as they are fixed and established under and by virtue of the particular provisions contained in the policy and the memorandum indorsed upon it, the accident which befell the wife of the captain, and the necessity of resorting, in consequence of it, to medical advice and assistance for her relief, constituted a sufficient and legal justification for the putting

in and detention of the brig at the port of Gibraltar. The broad and comprehensive proposition that delay or going out of the course for the purpose of succoring the distressed is said by Mr. Phillips to have been invariably held to be no deviation. And he adds, that if this principle, though always mentioned by elementary writers as an admitted and established doctrine of maritime law, is not often recognized by the courts, it is because a justification resulting so directly from the plainest principles of humanity, and in the sufficiency of which the assured and insurers are usually so much interested, has never been directly called in question. 1 Phil. Ins. § 1027.

It is true that the authorities to which he refers in support and illustration of this general proposition are cases where the object of the departure from the course was to carry relief to mariners or passengers destitute and suffering on board other vessels. But the principle is not confined to such cases. It has a wider and more general application. Its validity was recognized by the court in the case of *Kettell* v. *Wiggin*, 13 Mass. 68. There the vessel insured went out of her course from the Isle of May to St. Jago and Fuego and back to the Isle of May; and it was contended that this voyage was necessary and constituted no deviation, because there was a scarcity of provisions and water, and the crew might otherwise have suffered from a want of them. And Chief Justice Parker, in delivering the opinion of the court, said, that if the destitution was not occasioned by the negligence of the master, the excuse was sufficient and justified the departure from the course. It makes no difference whether the object of such departure is to alleviate the distress and administer to the necessities of persons who are lawfully on board, or of strangers suffering from disasters sustained by the loss or wreck of another vessel. The dictates of humanity are as forcible in the one case as in the other; and it would be strange and unreasonable if the law recognized any discrimination between them.

To make the excuse valid and effectual, it must without doubt be shown that there was a real necessity for the departure of the vessel from her proper course. The exigency which demands

relief must be equal in importance to the intervention which is required in its behalf. Whether it exists, and what it is, must always be questions of fact. To determine rightly all the circumstances of infirmity and suffering and of relief afforded on the one hand, must be considered in connection with the increased length of the voyage, the prolonged time required to accomplish it, and the additional risk incurred, on the other. Mr. Arnould lays down the rule, that only actual force and constraint, either moral or physical, will constitute a justification. But from the explanation which he afterwards adds, it appears that the requisite kind and degree of force may considered as being applied, where the state of circumstances is such, that the master, exercising a sound judgment, and acting for the best interests of all concerned, has no alternative left, as a prudent and reasonable man, but to take his vessel out of its course. 1 Arnould on Ins. § 152. The rule, thus qualified, neither excludes a consideration of the claims of humanity, nor fails to afford a reasonable degree of protection to the pecuniary interest of parties who have insured the safety of the ship. But if there is a conflict between the two, the former must, to the extent above stated, be regarded as of paramount importance.

The testimony of the captain upon the trial of the present action tended, we do not think it necessary now to express any opinion how strongly, to show the existence of an exigency which justified the departure of the vessel under his charge from the regular and onward course of the voyage, and its detention for the time it was delayed in the port of Gibraltar. But the presiding judge, considering that the facts disclosed in that testimony presented a question of law, which should be determined by the court before further progress was made in the cause, the fact whether such exigency existed was not tried nor submitted to the jury. In the view which we have taken of the whole subject presented in the report, we are of opinion that the former verdict which was taken for the defendants should be set aside and the case placed in order for trial. The question of fact whether there was a deviation will then be submitted to the determination of a jury, under proper instructions from the

27 *

court, conforming to the principles which have been already stated and explained.  And if it shall then be made to appear that the brig was taken into the port of Gibraltar and detained there solely for the purpose of affording succor to the distressed upon a fit and proper occasion, the defence relied on cannot be maintained.

It was testified by the captain, and it is also reported in the logbook, that while the brig was lying in the port of Gibraltar certain bales of merchandise were taken on board as part of her cargo.  And the defendants insist that the mere fact of taking cargo on board while she was lying in a port when there was no previous agreement or stipulation that the vessel should go in or remain for that purpose, did of itself necessarily constitute a deviation.  But this position is untenable.  If a ship, under the terms of a policy, or for any sufficient legal cause, is justified in originally entering into the port, her subsequent trading, by breaking bulk, loading or unloading, during the period of her lawful stay and detention there, although such trading, loading and unloading are foreign to the main purpose of the adventure, and not specifically provided for by the terms of the policy, will not be held to amount to a deviation.  1 Arnould on Ins. §§ 143 *&amp; seq. Lapham* v. *Atlas Ins. Co.* 24 Pick. 1. *Chase* v. *Eagle Ins. Co.* 5 Pick. 51.  But it would be otherwise if those operations caused additional delay, or otherwise substantially enhanced or varied the risk.  Of these matters the jury will judge upon the evidence submitted to them.

*New trial granted.*

At the second trial at March term 1856, before the chief justice, the defendants waived all objection to the plaintiff's recovery on the ground of deviation ; and it appeared that the vessel, after leaving Gibraltar to proceed on her voyage to the United States, and when about four days out, encountered a gale of wind, upon the character and force of which, its action upon the sea, and the combined action of the wind and sea on the vessel, much conflicting evidence was given ; and that, the vessel leaking so badly that many of the officers and crew considered it

unsafe to proceed, the captain concluded to put back, intending to return to Gibraltar; but after two days, the wind proving unfavorable to go to Gibraltar, put away for Cadiz, and reached that port, having been out from Gibraltar about eight days; that at Cadiz surveyors appointed by the American consul, at the request of the master, estimated the necessary repairs at over $6000, and expressed an opinion that the cost of a complete repair there would amount to more than the vessel would be worth when repaired; whereupon the master sold the vessel and appurtenances.

After the arrival of intelligence that the vessel had put into Cadiz in distress, the plaintiff signed and addressed to the defendants the following letter :

" Boston, November 5th 1851. Messrs. Page & Banks, Agents Augusta Insurance and Banking Co. Gentlemen, I am sorry to learn by the public prints that the brig Josephine has been compelled to put into Cadiz in distress, in consequence of sea peril encountered on her passage from the Mediterranean for New York; and that, being found irreparable on survey, she was condemned and sold. In consequence of this information I am compelled to abandon said vessel to your company, so far as she was covered by policy No.    .   And I now give you notice of a claim for a total loss. Whenever the documents come to hand, I shall submit them to you."

1. The chief justice, as he stated in his report of the trial, " instructed the jury, as above stated, not that the plaintiff would recover for a total loss without an abandonment, in consequence of the sale, but that if the vessel had suffered so much damage by a peril insured against, that the costs of repair would exceed half her value, deducting one third new for old, this was a constructive total loss, which, if followed seasonably by a valid abandonment, would warrant them in finding for a total loss. It was not objected that the abandonment was not seasonable, but that it did not sufficiently and truly state the cause. The letter of abandonment was produced ; and supposing that the construction of it was matter of law, the chief justice was of opinion that the words ' found irreparable

therein, did not mean physically incapable of being repaired at any cost; but incapable of being repaired, without expense after deducting one third, which would exceed one half of her value, as specified in the valuation ; and if that was the case, it was sufficiently stated in the letter, to make it a valid abandonment."

2. The plaintiff, in order to prove the seaworthiness of the vessel when she sailed from New York, offered the deposition taken at New York in 1854, and the certificate annexed to one of the answers, of Samuel Candler, who testified as follows :

" I am a marine surveyor, and have been so since the year 1843. I was a shipmaster about forty years, and commanded a great many vessels, before I was appointed surveyor by the chamber of commerce and board of underwriters in this city. The business of a marine surveyor is to survey hatches and stowage of cargoes, and to appraise, arbitrate and judge of vessels and goods arriving damaged or becoming damaged in the port of New York. Besides my business as surveyor, I have been for ten or eleven years inspector of vessels for Lloyds, London. My duty as inspector is to inspect vessels for the purpose of giving them their rate and character. I have no doubt that on an average I have inspected three vessels every working day during the last ten years. In inspecting a vessel for rating, we ascertain where she was built, how old is she, what timber she is built of, and her condition generally in hull, rigging and spars. This is inspection for rating. In inspection for repairs, we direct our attention to the particular damage to the vessel said to require repairs, and not so much to the other parts of the vessel.

" I examined a brig named Josephine. I do not remember when. I should think two or three years ago. I do not remember the name of the captain. She was lying in the port of New York. I do not remember at whose request or to what extent.

" I have examined the paper annexed to the commission.*

---

\* United States of America.                    Port of New York.
The undersigned, Samuel Candler, marine surveyor, and inspector for the un

The writing of that paper is in my handwriting, and the signature is mine. The statements therein contained were true at the date thereof, so far as I know or remember.

" A 2 means 'second rate' here and at Lloyd's. It means a vessel that has deteriorated from a higher rate by wear, or a vessel that is not perfectly constructed either as respects style or materials, or that has been crooked or strained or worked so as not to be perfectly tight. An A 2 vessel is considered just as safe, and will insure in this city, and I believe at Lloyd's, as low as an A 1 vessel, but she is not so valuable.

" I do not remember whether I saw the Josephine out of water or unladen; and I do not know of any means of refreshing my memory except from the certificate annexed to the commission That certificate is taken from the surveyor's books, and they would not contain any more particulars, unless the vessel was under repair, when they would state in addition what repairs had been needed and what were made.

" I do not remember the fact of the examination at all. In the usual course of my business I cannot rate a vessel without examining her sufficiently to judge of her seaworthiness. But in this case I have no recollection of the fact."

The chief justice " was of opinion that the certificate of the inspector, issued in the course of his business, and verified by his oath, was competent evidence."

3. Captain Alden Gifford, called by the defendants, testified that he was formerly a shipmaster, and now a marine surveyor and inspector of vessels in Boston. This question was put

---

derwriters at Lloyd's, does hereby certify and make known unto all to whom these presents shall come or may concern, that at the request of the parties interested, I have taken a strict and careful survey of the brig Josephine, Rogers master, of $232\frac{51}{95}$ tons measurement, built of the best materials at Scituate, Massachusetts, in 1833, copperfastened and coppered, tight, strong and substantial, calculated to wear well, a good easy model, fit to carry dry and perishable cargoes; rates A 2, and is worthy of full confidence.

In testimony whereof I have hereunto subscribed my name this 2d day of April in the year of our Lord one thousand eight hundred and fifty one.

Samuel Candler.

to him : " Whether if the foremast was sprung, the trysail split, and standing rigging such as to need .replacing at Gibraltar, the master would probably have known it ? " It was objected to, as a question not depending on nautical skill. Thereupon the chief justice ruled that it was a question not apparently depending on nautical skill of the witness, and not admissible.

The jury returned a verdict for the plaintiff for a total loss, and the defendants excepted to the rulings above stated.

These exceptions were argued at November term 1857.

*Choate & Bell,* for the defendants. 1. The abandonment was insufficient. The cause stated in the letter was that the vessel was irreparable ; this was not true in fact ; for she could have been repaired, though at a cost which would have exceeded half her value, deducting one third new for old. 2 Arnould on Ins. §§ 366, 379, 385, 403. 2 Phil. Ins. §§ 1681, 1684. *Peirce* v. *Ocean Ins. Co.* 18 Pick. 93. *Dickey* v. *New York Ins. Co.* 4 Cow. 222. Upon the plaintiff's construction, if she could be repaired at a trifle over that arbitrary amount, she would be irreparable in America, reparable in England.

The construction of this letter, being a mercantile instrument, was for the jury. *Carpenter* v. *Providence Washington Ins. Co.* 16 Pet. 495. *Etting* v. *Bank of United States,* 11 Wheat. 76. 2 Parsons on Con. 5.

2. The certificate of Candler was improperly admitted. The general rule is, that the least degree of evidence admissible is the recollection of the witness upon his oath. This paper does not come within any of the established exceptions. It is not introduced to prove a single act, such as the execution of a deed, or the posting of a notice, or the protest of a note ; but is an .extended and detailed narrative. Nor is it like a book of account, kept in the ordinary course of business, open to many eyes, and full of numerous particulars. The limit of proving matters done in the ordinary course of business is to show that there was no neglect of official duty. There was no necessity for the examination of the ship ; if there had been, it could easily have been remembered. Even entries in a log book are not evidence, unless the person who kept it will swear that on

his present recollection he believes them to be true ; and in fact he does in every case remember some facts. But this witness does not even remember that he was ever in the ship. Nor does he swear that he made the certificate at the time of the examination. No paper is admissible which is not the first which was made. 1 Greenl. Ev. § 437. *Merrill* v. *Ithaca & Owego Railroad,* 16 Wend. 596. *Doe* v. *Perkins,* 3 T. R. 749. *Alvord* v. *Collin,* 20 Pick. 430, 431. *Bunker* v. *Shed,* 8 Met. 152, 153. *Chamberlain* v. *Carter,* 19 Pick. 188.

3. The question put to Gifford concerned what would be visible to an eye sharpened by experience, and required nautical skill to answer.

*Hillard,* for the plaintiff.

BIGELOW, J. 1. The abandonment was sufficient. It gave notice to the insurers, that the cause of the loss was a sea peril, encountered on the passage of the vessel from one port to another, by which she was rendered irreparable. It would be giving too strict a construction to a document, to the validity of which no precise form or technical words are necessary, to hold that the word " irreparable " signified that the vessel was absolutely incapable of receiving repairs. Construed, as it ought to be, with reference to the mutual rights and liabilities of the parties under a contract of insurance, the more reasonable and natural inference from the language was, that the vessel had sustained damage by a peril insured against to an amount sufficient to absolve the insured from the necessity and duty of making repairs upon her, and to justify a claim for a total loss. If she was injured so that the cost of repairs, after deducting one third new for old, would exceed half her value as stated in the policy, it was not incumbent on the plaintiff to repair her. In this sense, she was irreparable by him, because such repairs would be inconsistent with his claim against the defendants for a total loss.

2. The certificate made by the marine inspector at New York as to the condition and seaworthiness of the vessel in the year 1851 was competent evidence. It was not a mere private memorandum, made for the purpose of enabling a witness to refresh

his memory, and recall and testify to the facts therein stated But it was a certificate made by a person of skill and experience, engaged in the regular and constant performance of a particular duty or service, well known and recognized among merchants and shipowners, and sanctioned by the usage and customs of business.

Nor was it the record of a past transaction merely, or of existing facts casually noticed, to which no importance was attached at the time. On the contrary, it was a statement of facts contemporaneous with the written memorandum, made for the purpose of giving information to parties interested in the subject matter to which it related, and which was acted on by them. It was therefore in its nature a semi-official document, and although not made in pursuance of any positive enactment or rule of law, it was nevertheless, like the entries made by bank clerks, messengers and other similar agents, competent evidence of the fact therein stated. It seems to us to come within the rule laid down and fully illustrated and explained in *Shove* v. *Wiley*, 18 Pick. 558.

Nor can it be fairly said that the certificate is not supported by the oath of the witness. Although he has no independent and distinct recollection of the facts therein stated, yet in connection with the certificate, and the usual course of his business, he does testify to the truth of the statement. *Smith* v. *Johns*, 3 Gray, 517. *Crittenden* v. *Rogers*, 8 Gray, 452.

3. The question put to the expert was inadmissible, because it asked that which did not require any special skill or experience to answer. No person competent to sit on a jury would need to be told whether a master of a vessel would " probably know that his foremast was sprung, his trysail split, and his standing rigging in such condition as to need replacing."

*Judgment on the verdict.*