## THE KENILWORTH.

(District Court, E. D. Pennsylvania. May 19, 1905.)

No. 45.

1. SHIPPING—INJURIES TO SEAMAN—TREATMENT—NEGLIGENCE OF MASTER—EVIDENCE.

On a libel against a vessel for failure to provide proper treatment for an injured seaman, evidence *held* insufficient to show that the master was negligent in diagnosing or treating the injury or in failing to put into port in order to afford libelant surgical assistance.

2. SAME—EXPENSES OF MAINTENANCE.

Where libelant sustained an injury while in the service of a ship on which he was engaged as a seaman, he was entitled to recover from it the expenses of his maintenance and cure at least during the continuance of the voyage.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Seamen, §§ 39–43, 186–188.]

In Admiralty.

Joseph Hill Brinton, for libelant.
Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. The libelant was a seaman on board the bark Kenilworth, and was injured during a voyage from Hawaii to the port of Philadelphia. His cause of action appears in the following extract from the libel:

"That on or about June 8, 1904, during the said voyage, at about noon on that day, whilst the vessel was at a point about 100 miles northeast of Cape Horn, the libelant was directed by the first officer to assist in the furling of the fore topgallant sail, in the execution of which order it was necessary for him to be on the main deck about midships, at which time the vessel shipped a heavy sea, which knocked the libelant down and broke his right leg above the knee. By reason of the injuries thus received, it became necessary for the libelant to have, and the master to furnish, such attention and care as was necessary under the circumstances for the fractured bone to be properly set in order that a cure might be effected. The master and officers of the said vessel, however, disregarding their duties in the premises, failed to give the libelant any care or attention whatsoever, notwithstanding his repeated requests to that end, but, on the contrary, had the libelant placed in the forecastle, where he remained until the arrival of the vessel at the port of Philadelphia, as aforesaid. The libelant further avers that by reason of the negligence and carelessness of the said master in denying the libelant due attention and care the fractured ends of the bone overlapped each other, and thus became knitted together, which has resulted in the shortening of the right leg by about two inches, which condition he believes to be permanent and incurable. The libelant further avers that, had the master afforded him reasonable and proper care in setting the fractured bone, his injuries would have been comparatively slight, and of a temporary character. The master, however, refused to believe that the bone was fractured, and therefore refused

attention to the libelant, and also refused to put in to the nearest port for medical attention."

There is some dispute about the facts, but I think the following account—in which I have made free use of the clear and satisfactory brief of the respondent's proctor—is correct in all essential respects:

The Kenilworth is a large four-masted bark of 2,147 tons net register, carrying 25 men all told, including the master. On June 8, 1904, while on a voyage from Hilo, Hawaii, to Philadelphia, in latitude 50 deg. 30' south, longitude 50 deg. 30' west, to the northward and eastward of Cape Horn, the vessel encountered thick, foggy weather, with a very heavy sea. Shortly after noon the libelant and three other men, who were engaged in furling the fore topgallant sail, were swept from the brace by a heavy sea, which carried them to the deck, where the libelant was washed against the ship's side, and from there to the steam winch, where he received the injuries complained of. The master, seeing the libelant holding to the mizzen rigging, called to him to jump down on the poop, but he replied that he could not, and that he thought his leg was broken. The libelant, by order of the master, was then brought on the poop, and from there was taken to the cabin, where he was stripped, and examined by the master, to ascertain if the leg was broken. The master placed one hand on the knee and the other on the thigh, but got no movement of the parts that were afterward found to be fractured, nor did he hear any grating noise, or crepitus, to use the surgical term. He also requested libelant to move his foot, and this movement was made. The master then said, "Your leg is not broken, because if it was you could not move your foot to save your life." The libelant could move his toes, ankle, and knee. A longitudinal discoloration about the width of two fingers, extending from the knee to the thigh, was also observed by the master, who concluded, as the result of his examination, that the leg was severely bruised, or that a tendon or muscle had been ruptured, and proceeded to treat libelant for that character of injury. A warm suit of underclothing was put on libelant, his leg was rubbed with arnica, and a bandage soaked with the same liniment was wrapped tightly around the leg from the knee to the hip. The libelant was placed in the cabin boy's berth, where he remained until the following day, when he was taken to the forecastle, in order that he might be in the company of his shipmates, and within call of the steward, who was in the kitchen, immediately adjoining.

The leg was rubbed first with arnica, and afterwards with opodeldoc, by the master or steward. When the swelling subsided, it was bathed with a solution of vinegar and water to take out the discoloration. To guard against fever, no salt provisions were allowed, but the libelant was given a light diet of arrowroot, macaroni, puddings, and similar food. The bandaging was done once or twice a day; for the first two or three days by the master, and then by the steward, until the libelant was able to do it himself. In about

three weeks he was able to go about on crutches, and from that time until the end of the voyage he was apparently cheerful and contented. Upon the assumption that the injury was a severe bruise or ruptured tendon, there was no obvious necessity for putting into port for medical or surgical assistance. The nearest place was Port Stanley, in the Falkland Islands, about 350 or 400 miles west by south, and this port was difficult to reach on account of the prevailing winds and the stormy conditions in that region. It was also a dangerous port to approach, and, moreover, it does not appear what facilities for surgical treatment it affords. By the time the vessel passed Pernambuco, Brazil (when she came nearest to the land on her regular course), the libelant was going about the deck. He made no complaint of neglect or ill treatment to the master, or to any one else in authority, and did not ask to be put ashore. So far as appears, no one who saw the leg believed it to be broken.

On the arrival of the vessel at Philadelphia, the libelant on July 27 walked on crutches several squares to the custom house, and from there rode in a trolley car, with an attendant, to the German Hospital. On August 1 the libel in this case was filed—most of the crew having meanwhile dispersed—and on August 4 libelant went to the Marine Hospital at Baltimore, where he remained until September 19. The master's and steward's depositions were taken on August 5, but it was not definitely ascertained that libelant's leg was broken until November 25, when a skiagraph or X-ray picture of libelant's injured leg was produced, which showed an oblique fracture of the upper third of the right femur, running through the bone from the outside, and disclosed also a longitudinal split of the bone extending from the oblique fracture to the knee joint. It was along the line of this longitudinal fracture that the master observed the discoloration that led him to conclude that the injury was probably due to a ruptured tendon or a bruised muscle running in this direction. The surgeons on both sides agree that the fracture was of an unusual character, and that as soon as the injury took place the powerful muscles of the thigh contracted, drawing the fractured ends of the bone past each other to the point where they are now united, and that no force could have then brought them into proper position so that the ends would have come together. This could only have been done by a gradual process of drawing them into place, which would have required skilled surgical treatment, and the use of a traction apparatus and appliances to be found mainly in hospitals, and not to be expected on board a ship. A surgeon called by the libelant testified that it was a difficult fracture to treat, that the setting of the bone was not a simple matter, that the most skillful surgeon might not have discovered crepitus (grating of the ends of the bones), that the cause of the longitudinal discoloration could only have been ascertained by knowledge which no layman could be expected to have, and that it is a popular belief that the power to move any part of a limb sets aside the idea of fracture. He would not say that the master was negligent in drawing the conclusion that the discoloration indicated a severe bruise, but thought him negligent in not discovering the transverse fracture. The sur-

geon called on behalf of respondent considered the result of the master's treatment as shown by the skiagraph to be a good result, testified that libelant was exceedingly fortunate in having a leg that he could walk on, that a nonprofessional man could not be able to discover the fracture, because the muscles are rigid, and hold the bones together, so that the movement in an unnatural direction that might indicate fracture even to a layman could not be induced, and that the master was wise in not attempting further to get this movement; as it might have torn an artery or vein, and might thus have resulted in the loss of the libelant's leg or his life. The libelant is able to walk with a limp on his injured leg, and there is no evidence that placing it in splints by the master would have affected the result in any way, or that he could thus have obtained any better use of the leg than he has at present. The eversion of the right foot, which showed after recovery, was caused by the contraction of the muscles at the time the injury occurred, and could not have been remedied, even if observed at the time, by any appliances on board the ship.

Upon these facts it is evident, I think, that the crucial inquiry is whether the master was negligent in not discovering that the leg was fractured. If his examination was so careless that he overlooked what he ought to have seen, he must be charged with the knowledge that would have been gained by a careful examination. It is not asserted—or, if such a charge is intended by the libel, it has not been proved—that the master was inhuman in his treatment of the libelant, or that he willfully or recklessly shut his eyes to the injury. The charge is negligence in examination and negligence in subsequent treatment, and, as I have just stated, the first inquiry must be: ought the master to have known that the leg was broken? Clearly, he cannot be blamed for his failure to discover the longitudinal split. There was no outward sign of this fracture, and I think the testimony shows plainly that, except for the X-ray, no one would know even now that the bone had been fractured along its length. Was the master negligent, then, in failing to discover the transverse fracture? If he is to be judged by the standard of the skilled surgeon, no doubt the answer would be in the affirmative; but this standard is much too exacting. The ordinary external signs were lacking. The ends of the bone did not protrude, being buried in the deep muscles of the thigh; the ends were not juxtaposed, and therefore there was no crepitus; the muscles were rigid and contracted so that unnatural movement was difficult, and probably dangerous, to induce; and the sole external sign that was present—shortening of the leg—could scarcely be detected except by measuring. And, to throw the examiner off the scent, there was the ability to move the toes, the ankle, and the knee—an ability which the popular belief, shared by the master, denies to a broken leg—and, even more, the broad and long discoloration, which seemed of itself to account for all the injury by pointing to a torn tendon or to heavy bruises. All the subsequent treatment shows clearly that the master's belief was honestly entertained, for it is incredible that he should have persistently bandaged the leg and rubbed

it with liniments if he knew all the while that it was broken instead of being bruised. Endeavoring, as far as possible, to reproduce the situation as disclosed by the evidence, and taking into account the conflict in the testimony of the surgeons concerning what should have been discovered by an ordinarily careful and intelligent man, I cannot reach the conclusion that the master failed in the discharge of his duty. He was wrong in his conclusion, of course, as now appears; but I think he was honest, careful according to his light, and that his judgment upon what he saw found plenty of support, both at the time and afterward.

If I am correct in this, it is not necessary to consider whether the master should have put into the nearest port. Certainly, a bruise such as this injury appeared to be, severe as it was, did not call upon the master to beat 300 or 400 miles to Port Stanley, at the cost, perhaps, of two or three weeks' delay, and especially when external improvement was soon apparent. The evidence satisfied me that, in view of the prevailing winds in that part of the South Atlantic Ocean, the port of Bahia, or of Pernambuco, was as near in point of time as any other; and when the latitude of Pernambuco was reached there was no apparent occasion for immediate treatment. Probably by that time the ends of the bones had already so far united out of their proper place that a remedy, even at the hands of the most skillful surgeon, would have been exceedingly difficult, if not impossible; for it is certain that when he arrived in this country, about three weeks afterward, the surgeons in Philadelphia and Baltimore declined to attempt an operation.

I have no disposition to minimize the obligation of a master to care for his crew, and to seek the best of help for them in cases of injury, even at the cost of considerable delay and inconvenience; but this obligation is to be reasonably enforced, and the master should not be held negligent because he is not a skilled surgeon, and has made a wrong diagnosis in an obscure and difficult case. Here I think the master did his best, and was not at fault, although he was misled. The cases cited by the libelant have all been considered. The rules of law they lay down are accepted without reserve, but the facts are so different—especially on the vital point of accurate knowledge concerning the injury—that I think they are all readily to be distinguished. The latest case on the subject is The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, in which the Supreme Court uses the following language:

"The duty to provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowner by all maritime nations. It appears in the earliest codes of continental Europe, and was expressly recognized by this court in the recent case of The Osceola, 189 U. S. 158, 47 L. Ed. 760, 23 Sup. Ct. 483. Upon large passenger steamers a physician or surgeon is always employed, whose duty it is to minister to the passengers and crew in cases of sickness or accident. Of course, this would be impracticable upon an ordinary freighting vessel, where the master is presumed to have some knowledge of the treatment of diseases, and in ordinary cases stands in the place of a physician or surgeon (The Wensleydale [C. C.] 41 Fed. 602); but for the further protection of seamen vessels of the class of the Iroquois are compelled by law to be provided with a chest of medicines and with such anti-scorbutics, clothing, and slop

chests as the climate, particular trade, and the length of the voyage may require. Rev. St. U. S. §§ 4569, 4572 [U. S. Comp. St. 1901, pp. 3100, 3101].

"What is the measure of the master's obligation in cases where the seaman is severely injured while the ship is at sea, has been made the subject of discussion in several cases; but each depends so largely upon its own peculiar facts that the rule laid down in one may afford little or no aid in determining another, depending upon a different state of facts. The early cases of Harden v. Gordon, 2 Mason, 541, Fed. Cas. No. 6,047, and Reed v. Canfield, 1 Sumn. 195, Fed. Cas. No. 11,641, contain an exhaustive discussion of the general subject by Mr. Justice Story. But as in both cases the disability occurred at or near a port, they are of no special value in this case.

"We have carefully examined the cases of Brown v. Overton, 1 Spr. 462, Fed. Cas. No. 2,024; The Chandos, 6 Sawy. 544, 4 Fed. 647; The Scotland (D. C.) 42 Fed. 925; Whitney v. Olsen, 47 C. C. A. 331, 108 Fed. 292; The Troop (D. C.) 118 Fed. 769; and Danvir v. Morse, 139 Mass. 323, 1 N. E. 123—and are of opinion that none of them fit the exigencies of the present case. We cannot say that in every instance where a serious accident occurs the master is bound to disregard every other consideration, and put into the nearest port, though, if the accident happen within a reasonable distance of such port, his duty to do so would be manifest. Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on shipboard, the proximity of an intermediate port, the consequences of delay to the interests of the shipowner, the direction of the wind and the probability of its continuing in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case. With reference to putting into port, all that can be demanded of the master is the exercise of reasonable judgment and the ordinary acquaintance of a seaman with the geography and resources of the country. He is not absolutely bound to put into such a port if the cargo be such as would be seriously injured by the delay. Even the claims of humanity must be weighed in a balance with the loss that would probably occur to the owners of the ship and cargo. A seafaring life is a dangerous one. Accidents of this kind are peculiarly liable to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen.

"To judge of the propriety of the master's conduct in a particular case, we are bound, so far as possible, to put ourselves in his place, and inquire whether, in view of all the circumstances, he was bound to put into an intermediate port."

So far, therefore, as the charge of negligence is concerned, to which the original libel was confined, I am of opinion that the testimony does not support it. An amendment that was recently allowed, however, introduces a new subject for consideration. The amendment is as follows:

"The libelant, in addition to that set forth in the libel, claims to recover for expenses which he has already incurred and may hereafter be obliged to incur in endeavoring to effect a cure, and for board and lodging during that time."

That the libelant, having suffered injury while in the service of the ship, was entitled to the expenses of his maintenance and cure, at least so long as the voyage lasted, cannot be denied. This is the first proposition laid down in The Osceola, 189 U. S., on page 175, 23 Sup. Ct. 487, 47 L. Ed. 760. But the libelant is claiming more, namely, not only expenses already incurred, but expenses likely to be incurred hereafter, in endeavoring to effect a cure, including board and lodging during both the past and future time. There is no evidence that he has incurred, or is likely to incur, any expense for medical or surgical treatment, and that item may there-

fore be laid aside. So far as possible, indeed, it appears from the slender evidence on the subject that the libelant has already been cured in a certain sense. That is to say, while he is no doubt permanently injured, nothing further can be done for him by medical or surgical skill. No ground exists, so far as has been proved, for an allowance on account of professional services. The item of board and lodging is made up of a charge of $4.50 per week from September 20, 1904, when he returned to Philadelphia from the Marine Hospital in Baltimore, to the present time. This sum has been paid, or assumed, for him by another person, and recovery therefor is sought under the amendment. The difficulty about allowing it, however, is that it does not clearly appear to have been an expense of maintenance during cure—assuming that the ship's liability continued after the voyage—but an expense incurred after the accomplishment of such cure as is now possible. No case, I think, carries the doctrine of maintenance so far as this, and it is obvious that no such indefinite liability can properly be imposed upon the ship. In some cases it might be equivalent to support during life, and even in a case of great hardship this would be out of the question.

But although, upon this point, the evidence is so meager that I do not feel justified in acting upon it, the burden of proof being on the libelant to show that any expense incurred since the date fixed by the amendment, September 20, 1904, is properly chargeable to the cost of cure, nevertheless, in order to avoid a possible injustice, I shall permit further testimony to be taken concerning this matter, the libelant to be allowed until June 1 and the respondent until June 10; the depositions to be strictly confined to the charge set up in the amendment.