## THE CUZCO.

### (Circuit Court of Appeals, Second Circuit. April 30, 1907.)

### (No. 217.)

**1. SEAMEN—INJURY IN SERVICE—DUTY OF VESSEL IN RESPECT TO MEDICAL ATTENTION.**

When the deviation of a vessel from her course in order to procure medical attention for an injured member of the crew would add substantially to the risks of the voyage, there must be some substantial exigency to justify it; at least reasonable ground to believe that consequences more serious than the mere pain and suffering which ordinarily attend the smaller catastrophies of a sailor's life are to be expected.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, § 39.]

**2. SAME—LIABILITY OF VESSEL.**

Libelant, cook on a steamship, was injured while the vessel was lying in Fortescue Bay, Straits of Magellan, by falling through a hatchway; his shoulder being dislocated and his head injured, the latter injury not being serious. The injuries were examined and treated by the master and steward, who decided that there was no dislocation of the shoulder, but merely a sprain, and the vessel proceeded on her course to the westward until she reached Coronel, 1,100 miles distant, when surgical treatment was obtained. The time ordinarily required to reach such port was 5 days, but owing to bad weather it took 7 or 8 days. By returning upon her course 70 miles in the Straits to Punta Arenas, medical aid could have been obtained. *Held* that, in view of the belief of the master, after examination, that the injury was not serious, and of the dangers of navigation of the Straits in the winter season, the decision of the master to continue the voyage, rather than expose the vessel and cargo to the risks of a return, was not unreasonable, and did not subject the vessel to liability.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, § 43.]

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the District Court, Eastern District of New York, in favor of libelant. The suit was brought by the cook of the steamship Cuzco to recover damages for injuries sustained by a fall through a coal bunker hatch while the vessel was in the Straits of Magellan on August 24, 1903. The district judge found the vessel free from fault, so far as the accident itself was concerned, but held that it was the duty of the master to have retraced his course 70 miles to Punta Arenas, so as to secure medical advice and assistance; that his failure to do so "probably aided the resulting abnormal condition of the libelant's arm, and added to his pain and discomfort"; and he held the steamer liable in the sum of $1,500 as a proper compensation therefor. The opinion below will be found in 148 Fed. 914.

J. Parker Kirlin and Charles R. Hickox, for appellant.

B. B. Coyne and Abbott & Coyne, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. We recently had occasion to consider the subject of a shipmaster's duty when a member of his crew is injured while the vessel is at sea or remote from medical aid. Greco v. The Sarnia, 147 Fed. 106, 77 C. C. A. 332. That case, however,

differs from the one at bar because medical advice was procurable as quickly by going forward as by deviating.

The situation of the vessel at the time libelant sustained his injury was as follows: She was bound from New York to Valparaiso, Callas, and other west coast South American ports, through the Straits of Magellan. Her first stop was Punta Arenas, located in the Straits 130 miles from the eastern entrance. Her next stop was to be at Coronel, on the west coast to the north of the Straits. At the time the accident happened, the Cuzco lay at anchor at Fortescue Bay, 70 miles beyond Punta Arenas, and 120 miles from the western entrance; Coronel being distant about five days sailing. Two days sailing apparently would carry her out of the Straits. A note on the chart says:

"In proceeding into the Pacific, ships should not attempt to clear the Strait in one day from Port Gallant [the head of Fortescue Bay], but endeavor to get into Playa Parda or Port Tamar before dark. * * * As the W. and S. W. gales come on very suddenly and without warning, it is impossible to run back and find an anchorage during a dark night."

The master had anchored owing to bad weather—a snowstorm the previous day and during that night. The passage through the Straits is manifestly more perilous for a steamer than navigation in the open ocean, and was a risk undoubtedly considered when the voyage was provided for. A significant "caution" is printed on the chart:

"As there has been no complete survey of Magellan Strait, the navigator is cautioned that although this chart may be considered a sufficient guide by daylight, he must not too implicitly trust in it during thick weather, as in some few instances the bearings from headland to headland are not strictly accurate."

It should be borne in mind that when the master was called upon to decide whether he should go on or turn back with the libelant, and thus add 140 more miles of dangerous navigation to the risks of the adventure, he had to take into consideration all the various interests which were committed to his charge. He was called upon to exercise sound judgment, not indeed on a question of pure seamanship, but on a question which involved maritime knowledge. A deviation for the purpose of succoring the distressed has been held not to release underwriters of ship or cargo who have insured for a specified voyage, but "to make such excuse valid and effectual it must without doubt be shown that there was a real necessity for the departure of the vessel from her proper course. The exigency which demands relief must be equal in importance to the intervention which is required in its behalf." Perkins v. Augusta Ins. & B. Co., 76 Mass. 312, 71 Am. Dec. 654. Arnould expresses the rule thus:

"The state of circumstances must be such as to leave the master no alternative, as a reasonable and prudent man, exercising a sound judgment, and acting for the best interests of all concerned, but to depart from or delay the usual course of the voyage." Marine Insurance (6th Ed.) vol. 1, p. 501.

This is, perhaps, rather strongly expressed, but there can be no doubt that, when the deviation adds substantially to the risks of the voyage, there must be some substantial exigency to justify it; there must be reasonable ground to believe that consequences more serious

than the mere pain and suffering which ordinarily attend the smaller catastrophies of a seaman's life are to be expected. When sitting in review, therefore, of the conclusion of the master reached on the morning of the accident, we should not lose sight of the fact that he had charge of a valuable ship and cargo, presumably insured under policies of the terms of which he was ignorant. Moreover, it is the decision made on that particular morning which is under review. By the next day the Cuzco would be so near the western outlet of the Straits that no one would contend that she should turn back for Punta Arenas through that imperfectly charted waterway, where snow or thick weather for two days (it was the winter season) might so delay her that she might reach that port no sooner than she might reach Coronel if she kept on.

Before discussing the facts, it may be convenient to review the authorities, so as to see what circumstances have been held sufficient to call for a deviation by the master in order to succor or relieve a member of the crew. While the Iroquois was rounding Cape Horn, libelant accidentally fell from the main yard to the deck, fracturing two ribs and his right leg in two places. The master with the aid of the carpenter set the leg in splints, kept the libelant in his berth, and after five weeks removed the splints, and found the leg apparently in good condition. Before arriving at San Francisco he was able to leave his berth, go on deck, and walk about with the aid of a crutch. But after arrival there it was found that, while his ribs had healed perfectly, the bones of his leg had not united, and amputation became necessary. It was held that the master should have put into Valparaiso, which would have caused five or six days' detention. In the course of the opinion it is suggested that each case depends so largely upon its own particular facts that the rule laid down in one may afford little or no aid in determining another. The court is bound, as far as possible, to put itself in the master's place, and inquire whether, in view of all the circumstances, he was bound to put into an intermediate port. "A seafaring life," says the court, "is a dangerous one; accidents of this kind are peculiarly likely to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen." The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955. In Brown v. Overton, 1 Spr. 462, Fed. Cas. No. 2,024, a seaman fell from aloft and broke both legs. The vessel was bound from Calcutta to Boston. Twenty-five days later she made St. Helena, distant above 40 miles, and it was held that she should have landed him there. In Peterson v. The Chandos (D. C.) 4 Fed. 645, libelant fell from aloft and broke his thigh bone; he also broke his collar bone and received a severe cut in the head. The master did not discover that the thigh bone was broken until some weeks after the accident. It was held that, if the ship could have made a port in five or six days, the master should have done so. In Olsen v. The Scotland (D. C.) 42 Fed. 925, there was no question of deviation. Libelant fell from the ladder when coming aboard at Antwerp, where he shipped. He notified the captain a few hours later, and the ship was held because when the vessel reached Flush-

ing, where she lay two days, no medical advice was obtained. In Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331, the mate of a fishing schooner was struck by the main boom, and his leg broken in two places. There was no one on board competent to treat such an injury. "There was no cargo on board, no danger of loss or damage on that account, the wind was fair and favorable, no peril to the ship," and it was held he should have gone to Port Townsend, 500 miles distant. In The Troop (D. C.) 118 Fed. 769, on appeal 128 Fed. 856, 63 C. C. A. 584, a seaman fell from the yardarm to the deck, fracturing his left arm and right thigh. The vessel was departing from the port of Fusan bound for Puget Sound, and had made only six miles from her anchorage in the inner harbor. The weather was calm. The captain, instead of sending him to the hospital at Fusan, undertook to treat the case himself, and shamefully neglected it. The ship was held liable. In The Eva B. Hall (D. C.) 114 Fed. 755, a seaman had his left forearm broken by a blow from a capstan bar while on a voyage from Fernandina to New York. There was no claim that the vessel should have put in anywhere. The court remarked that the master could not be expected to know positively that the arm was broken, but that the libelant told him it was broken and it was swollen and inflamed. The ship was held liable because, under these circumstances, the master threatened to put the wounded man in irons, and forced him, without necessity, to perform duties which would naturally result in an aggravation of the injuries. In Danvir v. Morse, 139 Mass. 323, 1 N. E. 123, the libelant broke his leg soon·after 1 a. m., when the vessel was not far from the entrance to Chesapeake Bay. Three hours later she passed within six miles of Fortress Monroe, with a fair wind for·that place or Norfolk, but the captain refused to land him at either place, but carried him on 170 miles further to Washington. The ship was held liable. In Campbell v. The Frank Gilmore (D. C.) 43 Fed. 318, where the vessel was not held liable, the court says:

"The steward of the boat looked after the libelant, and I think it is satisfactorily shown that he gave him reasonable attention. The steward examined the injured leg, and his judgment was that the injury was not at all serious, and simple remedies were applied with beneficial·results. All the officers believed that the hurt was but a simple sprain. True, when the marine surgeon at Pittsburgh came to examine the libelant's leg he found that he had sustained a partial lateral dislocation of the knee joint, but this was not apparent to unprofessional persons, and the officers of the boat had no reason to suspect that the accident was so serious. The libelant's own conduct at the time indicated that he did not regard the injury as a serious affair."

In The Kenilworth (D. C.) 137 Fed. 1003, affirmed by the Court of Appeals in the Third Circuit (144 Fed. 376, 75 C. C. A. 314, 4 L. R. A. [N. S.] 49), the libelant had been thrown by a heavy sea against the steam winch, and had broken his thigh bone. The accident happened to the northward and eastward of Cape Horn, and the vessel continued on her course to Philadelphia without touching at any of the South American ports. She came nearest to the land off Pernambuco, Brazil. The master examined the seaman, and came to the conclusion that the latter's leg was not broken, because there was no apparent movement of the parts of the bone, nor did he hear any grating noise or crepitus, and because the injured man was able to

move his toes and foot. He supposed such movement was impossible with a broken leg, in which supposition he was entirely mistaken. The Court of Appeals says:

" * * * The fact that the master did not perceive that Krelly's leg was broken is of primary and controlling importance. * * * That he was mistaken as to the true nature of the injury is now perfectly plain, but we concur in the finding of the court below that the opinion upon which he acted was honestly entertained by him. * * * In considering whether he was or was not duly careful, we are bound, so far as possible, to put ourselves in his place. He was not required to have the skill or discernment of a surgeon, and the opinion which he formed, if viewed in no clearer light than was afforded by such limited knowledge as may be justly attributed to him, does not appear to be an unreasonable one, and the treatment which he adopted, when considered in connection and conformity with that opinion, was neither negligent nor improper."

The accident in the case at bar happened a little after 4 a. m. Michael was found by the second cook lying unconscious where he had fallen, and was picked up and put in a berth. The steward was notified about 4:30 a. m. He hurriedly dressed himself, and went to investigate. He found Michael stunned, got him up and spoke to him, and washed his head out, whereupon he came to, and told how the accident had happened. The master was busy in the early morning getting the ship under way, and visited libelant about 7 a. m. He and the steward got him out of the berth, put him on a box, took off his shirt and examined him. There was a cut on his forehead, which was not bleeding at the time. The steward had already washed it out thoroughly with water containing a few drops of carbolic acid, and had cleaned it, picking out what coal and dirt he could find, and putting a plaster across it. There was a similar cut and bruise on the back of the head, which was similarly cared for. He was perfectly conscious, told the captain about the accident, and said he felt no particular pain except in his shoulder. The captain reached the conclusion that the injuries to the head were merely superficial scalp wounds —a correct diagnosis, for, except for pain in the process of dressing and healing, they gave him no further trouble. He complained of great pain in his shoulder, which was much swollen, especially when he moved it, and the captain made an examination, to discover if there were a dislocation, intending if there were one to reduce it himself. He had set broken bones before, but never reduced a dislocation. He expected to find a lump under Michael's arm if his shoulder had been out of place, but there was no lump there. The doctor explained to him at Coronel that it was on account of the shoulder being upwards instead of downwards; that if it had been downwards there would be a lump shown under the arm, but being upwards it was not. Having reached the conclusion that the libelant was suffering only from a severe sprain, the captain continued on his voyage for Coronel. The steward bathed his shoulder, put a roll under the arm, and bandaged it; he put opadildock on and turpentine liniment, and gave him turpentine liniment to put on the shoulder. The steward says he applied the liniment two or three times a day, and that at first Michael said he felt better, but later said he was sure his shoulder was out. Libelant said the steward visited him only twice before reaching

Coronel, and that he stayed in his berth four days. Whichever is correct, he certainly was put to no work until he saw the doctor at Coronel, who put him under chloroform, and reduced the dislocation. Libelant is now suffering from "ankylosis in the shoulder due to a dislocation sometime previous." Whether delay in reducing such dislocation, as the district judge found, "probably aided the resulting abnormal condition of the libelant's arm" is not altogether clear upon the proofs. But whether it did or not, we are not satisfied that conditions were such on the morning of the accident that the master should be held in fault because he did not turn back to Punta Arenas, exposing ship and cargo to 140 additional miles of navigation through Magellan Strait in midwinter.

The decree of the district court is reversed, and cause remanded, with instructions to dismiss the libel.